**KUSTOFF v. CHAPLIN et al.**

No. 9494.

Circuit Court of Appeals, Ninth Circuit.

May 24, 1941.

As amended May 31, 1941.

552

Michael I. Kustoff, of Los Angeles, Cal., in pro. per. for appellant.

Loyd Wright and Charles E. Millikan, both of Los Angeles, Cal., for appellees.

Before DENMAN and MATHEWS, Circuit Judges; BEAUMONT, District Judge.

BEAUMONT, District Judge.

This action was brought by Michael I. Kustoff to enjoin the showing of a motion picture entitled "Modern Times", and for damages for its exhibition. The picture was produced by defendants Charles Chaplin and Charles Chaplin Film Corporation, and distributed for exhibition by defendant United Artists Corporation. Plaintiff's complaint alleges that this filmed picture infringed his copyrighted book, "Against Gray Walls or Lawyer's Dramatic Escapes". Defendants had judgment in the district court. Plaintiff has appealed.

The book in question is an original work of appellant, copyrighted and published in 1934. The author states that it is a true account of incidents in his life. It also contains his observations on social and political problems.

The story from which *Modern Times* was filmed, according to the testimony of appellee Charles Chaplin, was originated by him and prepared for use under said appellee's direction, with the aid of Carter DeHaven. Chaplin's testimony was that he had had in mind the general idea of the photoplay many years before production of the film was begun; and there was further testimony that the writing of synopses of incidents, scenes and sequences from which the finished picture resulted, was commenced early in 1933. The picture was released for exhibition to the public in 1936.

For a better understanding of the case, we summarize book and picture.

### The Book

In his autobiography, *Against Gray Walls or Lawyer's Dramatic Escapes,* appellant narrates the story of a "life of persecution" occasioned, as he views it, by his militant devotion to the cause of the masses against the capitalistic classes of Russia and the United States. The story appears to fall naturally into three periods, the first dealing with his boyhood in Russia, the second with the struggle for a professional education in America, and the third with the vicissitudes attendant upon his practice of law.

The book opens with a brief account of the author's life on a farm in the Orel district of Russia, where he was born in 1897; of his schooling in Moscow and of his efforts to assist in the support of his family. It traces his progress as a youth in various revolutionary-study circles, and his

continued adherence to liberal principles when, at the age of seventeen, he was drafted into the White Russian Army, and admitted to a military college. It follows his service as an officer of the army in the years 1916, 1917 and 1918; his commission as a captain in 1917, and his appointment at the war's conclusion as Military Governor of a large province. The boyhood period is terminated abruptly when, after an abortive Communistic uprising in his province, he was first arrested for revolutionary activities and then, through the assistance of friends, enabled to escape to Vladivostok and hence, by way of an American military transport on which he stowed away, to the United States.

The second period finds the author at Mather Field aviation school at Sacramento, California, enlisted for one year's service pending his application for American citizenship. He outlines the story of his arrival at Sacramento, of his inability to make himself understood, of the finding of an interpreter and of the cordial reception accorded him as a World War hero when, through the interpreter, he made himself known. He tells of his attendance as honor guest at a luncheon given by the Sacramento Chamber of Commerce; of his transportation as an officer's guest to the aviation school, where he was again an honored guest. After a period spent in the servicing of airplanes in the military-college machine shops where, as his "liberal" sympathies became known, there was a waning of approbation by those who formerly had honored him, he was transferred to San Diego, and later to El Centro. There he engaged in patrol duty on the Mexican border. On one occasion he and his pilot were compelled, by reason of a heavy storm, to make a forced landing in the desert. He gives a very interesting description of this airplane ride in the storm.

At the conclusion of his enlistment the author received an honorable discharge; and then began his struggle to obtain a legal education in California.

To overcome a shortage of undergraduate credits necessary for entrance into a school of law, the author enrolled in Pasadena University, having been employed in the interim first as mechanic in machine repair shops, then for three weeks as butler to a "Pasadena millionaire", and thereafter as an employee of a hotel. He was employed as a motion picture extra from time to time. He tells a story of success as a student, and of leadership as an orator.

From a political speech made in defense of striking miners and from the three-weeks contact with the "millionaire" stems, according to his story, the "persecution" to which he was immediately thereafter subjected. Just prior to his final examination he was jailed on charges of writing bomb-threat letters to his former employer, but, after being subjected to the "third degree," was then released. Shortly after completion of his undergraduate course, through which he consistently maintained an outstanding scholastic rating, and just after he enrolled in the California Institute of Technology for the summer session, his former employer expressed interest in a scenario which the author had written. Almost immediately after the author delivered the scenario to his former employer for consideration, he was arrested a second time. Again he was subjected to a "third degree" and charged with the writing of threatening letters. Insanity proceedings were instituted against him. He was adjudged mentally sick but, not being dangerously so, was paroled. Some time later the charges against him were dismissed. He asserts that his apprehension was "framed" and that the conduct of the insanity hearing (which procedure he sets forth in considerable detail, quoting in part verbatim from the court record therein) was a gross miscarriage of justice. His capitalistic enemies accorded him treatment comparable to the "persecutions" of Tom Mooney, Maxim Gorky and Theodore Dreiser, he states.

Having lost his credits in electrical engineering by reason of his detention in jail, the author enrolled in Occidental College, where he continued to excel in his studies. He engaged in debates, and wrote scenarios in which he was unable to interest the studios.

Upon completion of his work at Occidental College, he entered the school of law at the University of Southern California. He worked at night in a hotel, took an extra-curricular course in salesmanship, and engaged during vacations in the selling of various products. Thereafter he returned to Pasadena University for his bachelor's degree. On discovering that his Bachelor of Arts degree would not be recognized at the University of California, where he hoped to continue with his law studies, he entered the summer school of

the University of California, and made up the necessary prerequisites.

Some time after entrance in the law school the author was witness of a disastrous fire which swept through the residential sections of the city of Berkeley, to destroy much of the city. He tells of the confusion and despair of residents as they tried to carry their belongings to safety, and of the assistance given by professors and students. One incident he recounts is of his rescue of a small child from a home which was already ablaze. Seizing a wet blanket, he ran to the side of the house, broke a window and proceeded through the smoke and intense heat to the child. Wrapping her in a blanket, he fought his way from the house and carried her to safety. At the conclusion of several hours additional "volunteer" work, he returned to his dwelling to discover his clothes and law books completely ruined. He was, by reason thereof, forced to find part-time employment in order to replace the loss.

Also while in law school he was chosen, as the result of a competitive match, to represent the "attorney for the defendant" in a mock trial presented at a Labor Day parade. He attracted much attention in proclaiming the cause of the downtrodden from a float emblazoned with "radical" placards.

The next year, after three unknown assailants attempted to effect a midnight entry into his dwelling, he filed a complaint with the police and received a verbal assurance that he might carry a pistol for his own protection. Almost immediately thereafter he was apprehended and confined at police headquarters on a charge of unlicensed possession of firearms. There, as the story narrates, he was refused assistance of counsel. He was examined by alienists and was then transferred to the Oakland Emergency Hospital. At the hospital, he says, the "third degree" was administered to him, his food was poisoned and lethal gasses were pumped at night into his room. After a frustrated escape attempt, he was at last brought to trial. He was found to be insane and committed to the Napa State Hospital.

From the Napa Hospital, after a considerable period of hard labor, relieved only by his constantly writing petitions seeking assistance from prominent officials throughout the country, and by the companionship of a large group of inmates who, he claims like himself, had been confined only because of their "radical" sympathies, he conceived a plan of escape. On the day he set for the attempt, having pretended that he had torn his work clothes accidentally, he obtained possession of his "Sunday" suit, and collected the papers he desired to take with him. The opportunity to escape came as the file of patients from the hospital tailor shop (where he was then working) moved from the shop into the ward. He succeeded in detaching himself from the file, and stole away to the door to the outside prison yard. There he encountered a new attendant in the process of opening the door to the yard. On the pretext of being likewise prepared to open the door, he apparently persuaded the attendant that he was also a guard, for when the attendant had opened the door he left it open and walked away. The author followed him into the yard. He then walked slowly across the grounds to the hospital wall, vaulted it, and ran across the valley to the protection of the hills.

In the hills, harassed constantly by pursuing hospital attendants and officers of the law, unable to rest for long intervals, and hungry, he attempted without success to milk a cow which was in a nearby field. When at last he was able to rest for a brief period, he dreamed that he was consuming a thick steak. Finally successfully outwitting the pursuers, he made his way to Sacramento, and from there to New York.

The third period of his life tells of his search for employment as a law clerk in the city of New York, such employment being a prerequisite to admission to practice in that state. He relates his valuable assistance to attorneys in trials of cases in that city; of his aid to one attorney which was so damaging to the case of opposing counsel that the latter protested his participation in the case. He also tells of his skill as investigator in negligence suits for another law office. Being unable to procure necessary scholastic records from California, and abandoning hope of admission to practice in New York, he journeyed to Miami, Florida, where he worked in the legal department of a land and title company. While in Florida he obtained an honorable dismissal from the University of California, his discharge from Napa Hospital and the reinstatement of his civil rights. Later he received his LL.B. from the University of Florida.

Leaving Florida, where he had encountered many difficulties, he proceeded to Washington, D. C., working there for a period, and becoming acquainted with numerous Russians. He was especially impressed with a Russian ex-prince, then working as a butler. He left Washington and drove back to the West, taking the old Spanish trail, with stop-overs in Dallas and El Paso, Texas.

Returning to Los Angeles he once again studied for the California state bar, took civil service examinations for the positions of deputy county clerk, deputy coroner, probation officer and the like but, so his account continues, in spite of passing grades, he was denied appointment to any position because his capitalistic enemies feared the rise of his influence. He took active part in various veteran and labor organizations. After studying for the California bar examination, he was unsuccessful in his attempt to obtain a passing grade. He again reverted to an attempt to market his scenarios.

The remaining portions of the book tell of the author's departure from Los Angeles for Texas, where he was admitted to the bar, and of his successful practice in El Paso. He details his public addresses in behalf of the masses, and his practice under the rule of comity in California courts, where he defended a Russian boy. He petitioned the governor of Oklahoma in a criminal suit (a verbatim copy of the petition being included in the text). He made a speech, he states, in defense of unemployed, hungry strikers (the speech also being included verbatim). He recounts his defense of poor clients in New York, Colorado, Oregon and other states, his attempts to become admitted to practice in California, and the "persecutions" which blocked the way to such admission. The autobiography concludes with lengthy quotations from speeches made, and legal pleadings filed by the author. He refers to newspaper articles in behalf of labor; he compares his own case with that of Lenin, and ends with lengthy condemnations of the capitalistic system in general, and of various governmental and public personages who, he claimed, had been instrumental in his "persecution".

## The Picture

*Modern Times* presents as its opening scene a herd of sheep, and then a subway crowd, followed by workmen hurrying to their labors in a factory. Charlie Chaplin appears as a laborer in a large machinery plant, where his only duty is to tighten nuts on metal plates carried constantly in front of him on a conveyor belt. The belt is caused to run faster and faster. Chaplin works faster and faster, but has great difficulty in keeping up with his work as the nuts go by on the belt. At noon an inventor brings into the plant an automatic feeding machine he desires to sell. Chaplin is selected as the one to be used in demonstrating the value of the machine as a time saver. He is placed on a seat in the machine. Soup is fed to him by the machine, but with disastrous results to his clothes and person. An attempt is made to give him, through means of the machine, other articles of food, but the success of the machine is nil, except as a laugh producer throughout that particular scene, which is quite long.

Chaplin goes back to work and tries so hard to do his work that he is subjected to a severe nervous strain. As a result he leaves the conveyor belt, carrying with him the two wrenches he has used in tightening nuts, and runs around inside the plant, trying to tighten everything that resembles a nut. Chaplin falls on a roller of a large machine; the machine is in operation. He climbs another large machine. Employees try to stop him. He swings by an overhead cable, landing on the floor, and runs to other machinery, throwing switches, stopping and starting machines. Then he escapes into the street. He sees a woman walking ahead of him, goes up behind her and endeavors to tighten some large buttons on the back of her dress, apparently of the opinion that he is still engaged in his work of tightening nuts. His nervous condition is recognized and he is taken to a hospital. After leaving the hospital he sees a truck in motion on a nearby street. On the end of the truck, as a warning of danger, is a red cloth attached to a stick. This falls to the ground close to Chaplin. He picks up the stick with the attached red cloth and runs after the truck in an attempt to restore it to its place on the truck; he waves the cloth to attract the attention of the driver. He does not know that immediately following him is a parade of men carrying various signs and placards. Policemen, seeing Chaplin waving the red cloth and running down the street, apparently leading the procession, arrest him as a disturber. He is taken to jail.

The picture next shows a girl of about sixteen, purloining bananas from a boat on the city's waterfront. The girl not only helps herself to the fruit, but throws some to smaller children who stand on the wharf. Upon discovery by the owner, she grabs some bananas and flees. The owner pursues her, but she eludes him, goes to her home and gives to her sisters the fruit she has brought. Her father appears. He is jobless and discouraged, but hungry; he eats some of the bananas.

The scene shifts to a jail where Chaplin is confined. A title here reads: "Held as a communist leader, our innocent victim lounges in jail." All prisoners are marched to a mess hall where a meal is served. Seated on one side of Chaplin is a large man who attempts to take all the bread near his plate. Chaplin as a result gets very little. On the other side of Chaplin is a drug addict. This addict, afraid of detection, upon seeing a squad of inspectors in search of narcotics enter the mess hall, fills a salt shaker with some white powdered drug he has theretofore had concealed on his person. He replaces the salt container on the table near Chaplin, who very shortly takes it and sprinkles its contents on his food, thinking it is salt. This he eats, and the effect is to give him a false courage. He takes some of the food of the big fellow, before whose prowess previously he had been cowed. Still feeling the effects of the narcotics and apparently having a consciousness of physical superiority, Chaplin after leaving the mess hall, thwarts an attempted jail break by some of the inmates. They shoot at him, but he knocks them down by slamming doors in their faces. He is praised by the jailer for this action and given a great deal of liberty.

In the streets near the jail there is trouble with the unemployed of the city. A man is killed who, it later appears, was the father of the motherless girls shown before in the banana-eating episode. Then follows a scene at the home of the girls, where officers come to take the girls to an orphans' home. The oldest girl, the gamin who stole the bananas from the boat, escapes from the officers.

Chaplin is again pictured in jail, but in a comfortable cell. He is treated as a guest, and likes the comforts of the jail. About this time his release is ordered. Just before he is to leave he is called to the sheriff's office, and while he is there, a minister of the gospel, accompanied by his wife, enters the room. The sheriff and minister leave for a visit to other parts of the jail. Chaplin and the minister's wife are served tea. The tea causes a rumbling sound in the stomachs of both Chaplin and the woman, which in turn causes embarrassment to both. The noise is so noticeable it even attracts the attention of the woman's dog, which is lying on the floor. When the sheriff and minister return, the minister and his wife say goodbye and leave the room. The sheriff tells Chaplin he may leave the jail, but he does not wish to leave. He asks if he cannot stay a little longer. He says he is happy there. The sheriff accompanies him to the door and gives him a letter of recommendation.

After release from jail, Chaplin obtains work in a shipyard. The foreman tells him to find a wedge and bring it to him. Chaplin searches for and finally sees one. He does not, however, notice that it is the key support of the hull of a large ship. He uses a sledge hammer to knock it from its place and launches the ship. This slides into the water with a huge splash. Realizing his mistake, he gets away from the shipyard and determines to go back to the jail he likes.

Next is shown the girl, who, being very hungry, steals a loaf of bread from a bread wagon. A woman bystander sees this and tells that it was the girl who stole the bread. The girl turns to flee and runs into Chaplin, knocking him down. She falls. The driver runs to where Chaplin and the girl are seated on the street, and takes the bread from the girl. An officer appears, and someone informs him that the girl stole a loaf of bread. Chaplin immediately states that he, and not the girl, stole the bread. The woman who saw the incident returns to the scene, and definitely charges that it was the girl, and not Chaplin, who took the bread. The girl is arrested.

Chaplin is next seen in a restaurant, where he orders a meal. He eats it, but has no money with which to pay. A policeman is called; he places Chaplin in custody, and takes him to a patrol wagon. The wagon is filled with men and women on the way to jail, one of whom is the girl who stole the bread. There is an accident of some kind, and Chaplin and the girl fall from the patrol wagon. The officer appears stunned, and Chaplin and the girl

escape. They walk away from the wagon for some distance, and seat themselves on a curb near a tree. While talking about their affairs Chaplin tells the girl that it would be nice to have a home, and then he describes, either as a product of his imagination, or of a dream, a "home" scene in which he and the girl are the actors. He makes this very attractive in his description to her, picturing a dinner scene, and relates that while they are in their home a cow enters and he milks the cow, obtaining fresh milk for their use. About this time a policeman appears, and they move on. Just before doing so, Chaplin says that sometime they will have a home, even if he has to go to work to get it.

Next is a scene in a department store where, as the result of an injury to the night watchman, Chaplin secures a job as watchman. In his first night's work he lets the girl into the store, and they proceed to investigate matters of interest to them; chief of these is the toy department. They both put on skates and skate from place to place in the store. They go into a furniture department and, seeing that the girl is tired, he insists that she take a rest. She gets into one of the beds placed on display and goes to sleep. Chaplin goes about his work, punching time clocks, a part of his duties as watchman. Burglars enter the basement and command Chaplin to keep still. One of them recognizes him as a former worker in the steel mill. This man says "We ain't burglars; we're hungry". After the burglars leave, Chaplin lies on the counter where he sleeps until the store is opened the next morning. He has failed to awaken the girl, who is still asleep in the "display" bed. A woman customer discovers Chaplin asleep; policemen are called by the store officials, and Chaplin is again placed under arrest.

Chaplin stays in jail a few days and, upon his release, the girl tells him that she has a home for them and is elated at the wonderful place she has found. Chaplin goes with her to this home. It is a most dilapidated, one-room structure. He is delighted, however, but every time he moves from place to place in the room part of the house or furniture falls or gives way to his grasp. They spend the night in their new home, the girl sleeping in the house and Chaplin in a lean-to, which is a piano box outside the house. The next morning Chaplin gets out of his piano box in a bathing suit and takes a swim in a nearby canal. He returns to the "shack" where the girl is cooking breakfast. After they have their breakfast Chaplin leaves in search of work. There is a large group of unemployed men awaiting call for work. Chaplin gets through the crowd and is hired. His employment is in a factory that has not been in operation for some time, and he is assigned to help a machinist put some machinery in repair. The machinist by accident gets into one of the machines and cannot extricate himself. He attempts to tell Chaplin what to do to get him out. Chaplin does the wrong thing and makes matters worse. While the machinist is in the machine and cannot get out, the lunch hour comes and he insists on having his lunch. Chaplin brings it to him, and attempts to help him get his food in position to be eaten. Finally the machinist is released from the machine in which he is imprisoned and, just as the work has started again, the men go on strike.

The girl in the meantime has obtained employment in a cafe as an entertainer. She was dancing on the street when the owner of the cafe saw her and offered her employment. She asks him if he will also give a job to her friend, Chaplin. She says that he is a waiter who can sing. Chaplin gets the job. There is a prolonged scene in the cafe in which Chaplin has great difficulty in carrying his tray of food over the heads of customers, and in supplying one of the guests with the food he has ordered. He drops the food here and there, chiefly on the patrons; there is a great deal of confusion, all with its comedy appeal. The girl gives a dance; Chaplin is then called to sing. He says he cannot remember the song he is to sing, and the girl writes it on his cuff. He then goes upon the floor of the cafe and sings this song. He makes a great "hit" with the diners, and with the manager, who offers him a steady job. At this point two officers enter the cafe. They recognize the girl as the one who had escaped from them when they came to her home and were to take her and her sisters to the orphans' home. They endeavor to take the girl in custody. She and Chaplin escape, however.

They are next seen walking along a country road. She is quite discouraged at the turn of affairs. Chaplin, though, tells her to "buck up, we'll get along". The picture fades out, showing as the final scene Chaplin and the girl walking down the road into the distance.

558

There are seventeen assignments of error made by appellant in his statement of points on which he relies for reversal. A number of these are but restatements of (1) his ground that the evidence is insufficient to support the findings of fact and (2) that the findings do not sustain the conclusions of law. With the exception of these (1 and 2), appellant relies in his said statement for reversal solely upon the failure of the court to find on certain matters.

The court made extensive findings, which covered all the material issues raised by the pleadings. (In two instances the court stated it was unable to make definite findings; these will be referred to later in the opinion.) All the findings were as favorable to appellant as the evidence warranted.

■ Appellant assigns as error the failure of the trial court to find that one Michael Shantzek submitted appellant's book to appellee Chaplin before the production of the film in question. The complaint alleged that Shantzek was acting as agent of appellees Charles Chaplin and Charles Chaplin Film Corporation; that as such agent Shantzek received said book from appellant, and that he delivered it to Chaplin. Appellees denied such allegations. The court found that Shantzek was not the agent of said appellees, or of either of them; and made the further finding that "the court is unable to determine from the evidence as to whether Michael Shantzek delivered said book to any person by whom said book was delivered to Charles Chaplin or to any agent, writer, or employee of said Charles Chaplin Film Corporation".

The testimony upon such issue was substantially as follows:

Cecily Pollock, one of appellant's witnesses, testified that she had known appellant Kustoff since 1934; that his book was published in April, 1934, and that in the first part of May, 1934, she was in the company of appellant when they met Michael Shantzek, who said that he was an agent of Charles Chaplin; that Shantzek told appellant in her presence that he had taken appellant's book to Chaplin; that Chaplin had received the book from him, and after about two weeks Chaplin had returned it to Shantzek with the statement that he had read it carefully, but did not care to consider it for his studio use.

Appellant called Michael Shantzek as a witness, and his testimony was as follows: that he had known appellant Kustoff since about 1934; that he was not an agent of Charles Chaplin, but that he told appellant he knew a person, whose name he did not remember, who was acquainted with Chaplin; that in 1934 he (Shantzek) took appellant's book and gave it to this man to deliver to Chaplin; that in about two weeks the book was returned to him by his acquaintance, who stated that Chaplin had said he was not very much interested in the book—not enough to buy it or to make a loan upon it; that he met appellant Kustoff and Miss Pollock at a later time, probably in May, 1936, and stated what he had done, which was substantially as above set out. The following excerpts are from the reporter's transcript of the testimony of the witness Shantzek, given at the trial:

"Cross-Examination.

"Q. By Mr. Millikan: Mr. Shantzek, as I understand it, you gave a copy of this book to some person, whose name you do not now recall, with the request that he in turn deliver it to Mr. Chaplin? A. Yes, I did.

"Q. About two weeks later this same person gave it back to you? A. Yes.

"Mr. Millikan: That is all.

*    *    *    *    *

"The Court: Did you ever work for the Chaplin organization at all or for Mr. Chaplin himself?

"The Witness: No.

"The Court: Have you ever had any personal contact with any of the organizations?

"The Witness: No, none.

"The Court: Or with him personally?

"The Witness: None.

"The Court: Is the court to understand that all you are testifying to is that this gentleman you knew told you that he had submitted the book to Chaplin, that Chaplin had read it; is that the extent of what you wish the court to understand?

"The Witness: That is exactly it.

*    *    *    *    *

"The Court: Did you ever tell him [Kustoff] you were Chaplin's agent?

"The Witness: No.

"The Court: Or did you ever tell the plaintiff and Miss Pollock, or did you ever tell the plaintiff in the presence of Miss Pollock that you were Chaplin's agent or an agent for any of these companies?

"The Witness: No; I never said that. * * *"

Appellant Kustoff's testimony with reference to the question of delivery of the book to appellees was substantially the same as that of Miss Pollock.

Appellees' testimony: Alfred Reeves testified that he was vice-president and general manager of the Charles Chaplin Film Corporation, and that he had held such offices since 1924; that he had never seen appellant's book before the time of the trial; that to his knowledge a copy of the book had never been in the studios of appellees. Katherine Hunter testified that she was secretary to Chaplin in the years 1932 and 1934, and that she had never seen a copy of appellant's book. Chaplin testified that he had no recollection of having seen appellant's book prior to the trial of the cause, and denied having ever read any portion thereof. On cross-examination he stated that he did not know whether or not DeHaven had had appellant's book at the time appellees' photoplay was being drafted; that DeHaven never referred the book to him; never talked about it and that in his opinion DeHaven never had read it. In answer to a question put by the court, Chaplin further stated that Michael Shantzek never delivered a copy of appellant's book to him. DeHaven did not testify.

From the foregoing it is clear that there was no competent testimony upon which a finding reasonably could be based that Shantzek had submitted or delivered appellant's book to appellees, or any of them. The finding was as favorable to appellant as the evidence justified. If a definite finding had been made on such issue, it clearly appears from the evidence and the other findings that it would have been against appellant's contention. In such situation there is no reversible error. Meadows v. Snyder, 209 Cal. 270, 276, 286 P. 1012; Hulen v. Stuart, 191 Cal. 562, 572, 217 P. 750; Krasky v. Wollpert, 134 Cal. 338, 342, 66 P. 309; Shepard v. Yale, 94 Cal.App. 104, 108, 270 P. 742; Hersom v. Hersom, 60 Cal.App. 383, 384, 212 P. 717. In addition, the failure so to find is immaterial in view of the findings that were made. This will be referred to later.

The court made the following finding of fact: "From the direct evidence the court is unable to find whether or not any of the defendants read or did not read the book 'Against Gray Walls or Lawyer's Dramatic Escapes', but that the indirect or circumstantial evidence and inferences to be drawn therefrom indicate that portions of the book, as shown by a comparison of the book with the defendants' motion picture entitled 'Modern Times', which said motion picture was viewed by the court, and also as shown by plaintiff's bill of particulars, indicate access to the book prior to and during the preparation and production of the motion picture, *but that such matters indicating access to the said book are not a substantial copying within the decision of Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d page 1, of plot, incidents, characters, situations or any copyrighted features of the plaintiff's said book.* (Italics ours.)

"The court further finds that the treatment of the philosophy, if any, underlying said book 'Against Gray Walls or Lawyer's Dramatic Escapes' and the silent motion picture entitled 'Modern Times' is substantially different."

In Harold Lloyd Corporation v. Witwer, supra, plaintiff Witwer sought to enjoin the exhibition of the film, "The Freshman", produced by the defendant Harold Lloyd Corporation, and to recover the proceeds derived from its exhibition, on the ground that the film infringed the copyrighted story written by said plaintiff, entitled "The Emancipation of Rodney". Judgment for plaintiff was reversed on appeal. The basis for the holding of the court so referred to in the above-italicized finding is discussed in 65 F.2d at pages 18, 19, 27 and 28 (subdivisions 14, 15, 20 and 21 of the opinion). Such holding is in effect that a copyright for a story is not infringed by a photoplay unless an ordinary observer of the motion picture is led to believe that it is a picturization of the story. We are sure that the trial-court judge had such test of infringement in mind when the findings were made; his remarks from the bench at the time of the submission of the case confirm this view. They are as follows:

"The decision of the court in the Witwer case has been stated. I am not going to take the time to read it again; it is clearly understandable. It is stated succinctly thus on page 18 of the main opinion:

" 'The question really involved in such comparison' * * * that is, the comparison between the literary property, the story, 'The Emancipation of Rodney', and the motion picture—'is to ascertain the effect of the alleged infringing play upon

the public, that is, upon the average reasonable man. If an ordinary person who has recently read the story sits through the presentation of the picture, if there has been literary piracy of the story, he should detect that fact without any aid or suggestion or criticial analysis by others.'

"Now, let us apply that here. The court in the presence of counsel saw the picture exhibited. The court has read the story and read it [again] during this trial. The court was endeavoring to place itself in the position of an ordinary person who was not there for analysis of the philosophy, who was not there as a student of any particular social or political or economic belief, but who went there as most people who go to see Chaplin's pictures, for the purpose of amusement. There was no such impression left in the court's mind that the picture was copied from the book notwithstanding the fact that the court had in its mind this bill of particulars, which, in some respects, was factual and in others argumentative, similarities pointed out by Mr. Kustoff, some of which exist and which I will later on discuss either generally or in more detail, but the picture as a whole to the court, with the psychology or suggestion of the bill of particulars in its mind or part of the bill of particulars, did not present to the judge of th's court any definite, fixed view that it was copied from the work in question, Mr. Kustoff's work: 'Against Gray Walls or Lawyer's Dramatic Escapes'."

▪ Appellant contends that the court should have found that appellees read his book and copied their film therefrom. From the direct evidence no finding reasonably could have been made that appellees, or any of them, read the book; and the court properly refused to make such finding from the testimony, a summary of which hereinbefore has been set out.

▪ Assuming, however, that said finding indicating access, and based on the circumstantial evidence, means that appellees did read the book before or in the course of production of the motion picture, this, of itself, avails appellant nothing. Reading, alone, is not sufficient to show infringement. In order to prove infringement there must have been copying of a *substantial* portion of the copyrighted work. Such copying is essential to recovery in an action for infringement of a copyright. Perris v. Hexamer, 99 U.S. 674, 675, 676, 25 L.Ed. 308; Oxford Book Co. v. College Entrance Book Co., 2 Cir., 98 F.2d 688, 692; Carr v. National Capital Press, 63 App. D.C. 210, 71 F.2d 220; Ansehl v. Puritan Pharmaceutical Co., 8 Cir., 61 F.2d 131, 137, certiorari denied, 287 U.S. 666, 53 S.Ct. 224, 77 L.Ed. 374; Frankel v. Irwin, D.C., 34 F.2d 142, 143; Dymow v. Bolton, 2 Cir., 11 F.2d 690, 691; Eggers v. Sun Sales Corp., 2 Cir., 263 F. 373, 375; Springer Lithographing Co. v. Falk, 2 Cir., 59 F. 707, 712, writ of error dismissed 17 S.Ct. 998, 41 L.Ed. 1179; Caruthers v. R.K.O. Radio Pictures, D.C., 20 F.Supp. 906, 907; Hirsch v. Paramount Pictures, D.C., 17 F.Supp. 816, 818; Sheldon v. Metro-Goldwyn Pictures Corp., D.C., 7 F.Supp. 837, 842, reversed on other grounds, 2 Cir., 81 F.2d 49. Upon this point the court's finding was definitely against appellant. The finding that "such matters indicating access to the book are not a substantial copying within the decision of Harold Lloyd Corporation v. Witwer * * *" simply means that in the instant case the court applied the test employed in the Witwer decision, that of the ordinary observer, and found as a fact that there had been no copying of appellant's book or of a substantial portion thereof. Such finding is fully supported by the evidence.

▪ We shall now refer to the alleged errors of the court in failure to find on certain matters, designated in appellant's assignments of error, and not heretofore specifically considered. It is our view that many of the matters to which no reference was made in the findings did not have any bearing whatever on the issues, and that the evidence was insufficient to support a finding in favor of appellant on any of such matters. It would unduly lengthen this opinion to consider these separately herein. Moreover, there is another reason such failure to find does not constitute prejudicial error, and this applies alike to all said assignments of error. It is that the findings that were made control the judgment. It already has been noted that there can be no infringement unless there is copying of a substantial portion of a copyrighted work. When the court found that there was no substantial copying of appellant's book, it was of no consequence whether or not other issues were determined, for appellant could not prevail unless the finding on the issue of substantial copying had been in his favor. Such finding was the keystone of the trial court's decision. It is well established that when the

findings of fact actually made control the judgment, failure to find upon other issues becomes immaterial. There was no reversible error in such failure to make findings. United States v. New York C. & St. L. R. Co., 6 Cir., 32 F.2d 887, 890; Alberti v. Jubb, 204 Cal. 325, 267 P. 1085, 1087; Hertel v. Emireck, 178 Cal. 534, 174 P. 30; Fogg v. Perris Irr. Dist., 154 Cal. 209, 97 P. 316; Roney v. Reynolds, 152 Cal. 323, 325, 92 P. 847.

Appellant sharply criticises the decision of Lloyd Corp. v. Witwer, supra. The holding in that case that there can be no infringement of a story by a film unless an ordinary observer is led to believe that the film is a picturization of the story, is well supported by authority. White-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1, 17, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann.Cas. 628; Barbadillo v. Goldwyn, D.C., 42 F.2d 881, 885; Nichols v. Universal Pictures Corp., D.C., 34 F.2d 145; Dymow v. Bolton, supra; Roe-Lawton v. Hal E. Roach Studios, D.C., 18 F.2d 126, 128; King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533, 535. See also, Carr v. National Capital Press, supra. The Witwer decision likewise has been cited with approval upon the same point in Seltzer v. Sunbrock, D.C., 22 F.Supp. 621, 628, and Echevarria v. Warner Bros. Pictures, D.C., 12 F.Supp. 632, 638.

Appellant further contends that as a finding was made indicating access, the court as a corollary should have found in his favor on the question of copying, citing as authority for this position, Dellar v. Samuel Goldwyn, Inc., 2 Cir., 104 F.2d 661. Appellant's contention finds no support in such decision. That case came before the court on a motion to dismiss the bill of complaint. On such motion, as is well understood, all of the well-pleaded allegations of a complaint are assumed to be true. In this case the question of substantial copying was not based on assumption, but was one to be determined from the evidence.

Appellant has presented a detailed account of alleged similarities between book and film. Such comparison is entirely unpersuasive of plagiarism. It is our view that no useful purpose would be served to discuss in detail such claimed similarities. The book and film are so essentially dissimilar that in our opinion the evidence would not support a finding of substantial copying had one been made.

The evidence supports the trial court's findings; and the conclusions of law flow logically from and are sustained by the findings.

At the request of both appellant and appellees, the judges participating in this decision viewed the motion picture, *Modern Times*. We have read the book *Against Gray Walls or Lawyer's Dramatic Escapes*. After so doing we unhesitatingly adopt that part of the statement of the learned judge of the district court who tried the case, wherein he said there was no "impression left in the court's mind that the picture was copied from the book * * *."

We find no such similarities between book and film that would cause the ordinary observer to believe that the film has picturized appellant's book, or any substantial part thereof. There is no infringement.

Judgment affirmed without costs.