54 F.Supp. 425 (1944)
DIECKHAUS
v.
TWENTIETH CENTURY-FOX FILM CORPORATION.
No. 904.
District Court, E. D. Missouri, E. D.
March 4, 1944.
*426 J. Porter Henry and Robert D. Evans, both of St. Louis, Mo., for plaintiff.
Boyle & Priest, of St. Louis, Mo., and Edwin P. Kilroe, of New York City, for defendant.
MOORE, District Judge.
Plaintiff bases her cause of action on an alleged pirating of portions of her unpublished novel entitled "Love Girl" by defendant in production of the movie "Alexander's Ragtime Band". No statutory copyright was issued on plaintiff's novel, but she claims to have preserved her exclusive property in her work according to common-law principles, that is, by not publishing the book. Plaintiff completed her novel sometime prior to the year 1934 and in January of that year delivered two copies of it to the Copyright Office for the purpose of securing a copyright. The manuscripts were not printed, and for that reason the Copyright Office returned them to plaintiff and notified her that they could not be deposited or a certificate of registration issued.
Under this state of facts, plaintiff did not secure a statutory copyright. She tendered copies of her book to the Copyright Office, but they were refused and no deposit of the copies was made. While it has been held that deposit of a book in the office of the Librarian of Congress in accordance with the Copyright Act, 17 U.S. C.A., is tantamount to publication (Bobbs-Merrill Co. v. Straus, 2 Cir., 147 F. 15, 15 L.R.A.,N.S., 766; Jeweler's Mercantile Agency v. Jewelers' Weekly Pub. Co., 155 N.Y. 241, 49 N.E. 872, 41 L.R.A. 846, 63 Am.St.Rep. 666), that the rights incident to a statutory copyright accrue with such deposit (Caliga v. Inter-Ocean Newspaper Co., 7 Cir., 157 F. 186; Shilkret v. Musicraft Records, D.C., 43 F.Supp. 184) and that the author's common-law copyright is thereafter dead since the author is deemed to have made an election between statutory and common-law copyright (Photo-Drama Motion Picture Co. v. Social Uplift Film Corp., 2 Cir., 220 F. 448; Loew's, Inc., v. Superior Court, 18 Cal.2d 419, 115 P.2d 983), the refusal of the Copyright Office in this instance to file this book or to issue a certificate of registration was in accordance with regulations providing that only printed documents would be filed, and left plaintiff's position with respect to her common-law copyright unchanged. None of the cases cited hereinabove holds that an applicant for registration of an unpublished work under Section 11 of the Copyright Act, 17 U.S.C.A. § 11, loses his or her common-law copyright by tendering books to the Copyright Office and failing to accomplish what the statute provides because of non-compliance with the statute or regulations made thereunder.
Subsequent to her attempt to copyright her work, plaintiff submitted her manuscript to several persons in St. Louis, where she resided, for criticism, but there is nothing in the evidence to indicate that she made any public revelation of the work, and we hold that she has an existing common-law copyright on her novel. On January 24, 1937, plaintiff mailed a copy of her manuscript to herself in a sealed package; the seals remained unbroken until the sealed copy was examined by counsel at the direction of this court. That copy is before the court, marked "Exhibit 5".
Defendants not only deny that any similarity exists between their movie and plaintiff's novel, but deny that any of them *427 ever read the novel or had access to it. Plagiarism is copying (Wilson v. Haber Bros., 2 Cir., 275 F. 346; Becker v. Loew's, Inc., 7 Cir., 133 F.2d 889) and copying implies access. Since access to the allegedly plagiarized work by the alleged plagiarist is a sine qua non of this cause of action, the facts pertinent to that issue will be reviewed briefly. After failing to obtain a statutory copyright, plaintiff submitted her novel to a Mrs. Mabel Malone, who held herself out as a literary agent and critic. Mrs. Malone, for a small fee, read and criticized the novel. She returned plaintiff's manuscript to her and suggested to plaintiff that, since the work was designed to serve as a vehicle for the introduction of popular songs, it might well be offered to Irving Berlin for exploitation. Subsequent to this episode, Mrs. Malone moved to Hollywood, where she has remained, following her profession of literary agent and critic. When questioned regarding her connections in Hollywood, Mrs. Malone denied any acquaintanceship or business relation with any of the defendants, or with any of the defendants' employes who were concerned with the fabrication of the scenario for the accused movie, or with any of the other persons with whom plaintiff had dealings.
After showing the manuscript to Mrs. Malone, plaintiff had her niece, a Mrs. Hillis, make a typewritten copy: this was done in 1936. The second copy was shown to a Dr. Wieman and later to a Mr. Phillips. Then on January 24, 1937, plaintiff mailed this copy to Laurance R. D'Orsay, a literary agent and critic doing business in Hollywood. On the same day, the original manuscript was sealed, as described above. The second copy, marked "Exhibit I" in evidence, was identified by Mrs. Hillis, Dr. Wieman and Mr. Phillips as the copy that they had seen.
The facts detailed thus far are not disputed. There is conflicting evidence as to the length of time plaintiff's manuscript was in D'Orsay's possession and as to whether or not it was under his exclusive control from the time he received it in the mail until he returned it to plaintiff. The latter testifies that the manuscript was not returned to her until May 2, 1937; D'Orsay states that he kept the manuscript for only twelve days before returning it, but at another point in his testimony says that he returned it on March 24, 1937. On the other question, D'Orsay testifies that it was the invariable practice in his office for him to personally read all novels submitted and to keep them in his possession until they were returned to the authors; on the other hand, plaintiff's evidence tends to show that D'Orsay had several employes, that manuscripts were sometimes referred to one or the other of them for reading, that manuscripts were kept in a closet accessible to various persons.
The foregoing facts prove no more than that the manuscript was temporarily out of plaintiff's control and was in Hollywood, the same city in which defendant's employes carried on their endeavors. We certainly cannot infer from this alone that defendant's employes had access to plaintiff's novel for the purpose of copying it. However, we think the facts before the court are such as show that such access was not impossible and, therefore, lay the foundation to permit the ultimate fact of access to be inferred from similarities, if any appear, between the novel and the movie. See Simonton v. Gordon, D.C., 12 F.2d 116; Frankel v. Irwin, D.C., 34 F.2d 142; Dam v. Kirk La Shelle Co., 2 Cir., 175 F. 902, 41 L.R.A.,N.S., 1002, 20 Ann. Cas. 1173; Wilkie v. Santly Bros., 2 Cir., 91 F.2d 978.
To say that plaintiff's novel is bad, or amateurish, or even that it represents the nadir of literary accomplishment, would be beside the point, since neither quality nor merit is a pre-requisite for obtaining the protection of literary property accorded by the law. Vernon v. Sam S. & Lee Shubert, Inc., D.C., 220 F. 694, 696. If the novel "Love Girl" is plaintiff's work (and we find that it is), then she is entitled to the protection of her rights in her property regardless of its worth or lack of worth as a piece of literature. The court will, therefore, endeavor to refrain from any literary criticism.
Plaintiff claims that substantial portions of her novel, but not the novel in its entirety, were copied by defendant in the production of its movie. In the first place, it is argued that each character in the movie finds a counterpart in the novel, although there are some additional characters in the novel who are not represented in the movie; furthermore, the relationships between the characters are said to be substantially the same. Finally, it is contended that various scenes in the novel are to *428 be found in the picture, involving in both cases the same characters, incidents, action and dramatic effects.
In behalf of defendant, there is evidence to show that the original inspiration to make a movie based on Irving Berlin's tune "Alexander's Ragtime Band" came to Darryl Zanuck, vice-president in charge of production at defendant studio. Irving Berlin, himself, wrote a sketch of the story to be embodied in the proposed production. A professional film writer, Richard Sherman, was then engaged to write a treatment of the Berlin story. After conferring with the song-writer, Sherman began work on his script December 9, 1936, and finished work on March 3, 1937 (during this period, plaintiff's manuscript was in Hollywood). Sherman's scenario was not satisfactory to the producer, Darryl Zanuck, and another writer of recognized ability, Sheridan Gibney, was detailed to render a treatment of the Berlin story. Zanuck was not satisfied with this treatment either and engaged two more writers, Miss Kathryn Scola and Lamar Trotti, to work together on a third treatment. Trotti and Miss Scola worked on the story from June, 1937, until January, 1938. All of these writers are professionals with considerable experience, and each of them denies having ever seen or heard of plaintiff's story or knowing plaintiff, or any of the literary agents mentioned above.
Nevertheless, access may be inferred from similarity between the two works, as is stated above, and we will, therefore, proceed to an examination of the alleged similarities between the novel and the movie. Each deal with people of the entertainment world. The principal characters of plaintiff's book are Hubert Alexander Landcaster, an orchestra leader; Marzella Ralston (who uses a stage name, Zella Lane) a singer of popular songs and composer of a hit tune; and Lambert Waynemore, Hubert's close friend and pianist in his orchestra. The movie was intended as a paraphrase of Irving Berlin"s own career and has for its principal characters, Roger Grant (Alexander), an orchestra leader; Stella Kirby, a singer of popular songs and the composer of a hit tune; and Charlie Dwyer, a close friend of Roger and pianist in his orchestra. Other characters who figure in the movie are an old-fashioned professor of music who taught the principal character; a wealthy spinster who is interested in furthering the latter's career as a concert violinist; a taxidriver; a theatrical producer from New York, who gives the girl singer an opportunity to become a star; a bootlegger; and male and female characters who perform specialty acts with the principal character's orchestra. In plaintiff's book there is likewise an old-fashioned professor of music who is the orchestra leader's teacher, a spinster interested in furthering the latter's career as a concert violinist; a taxi driver; a night club operator from New York who gives the girl singer an opportunity to become a famous entertainer; a bootlegger; and male and female performers with the principal character's orchestra. A second orchestra and its leader, Guido, figure in the book, whereas there is only one orchestra and leader in the movie. It is alleged that, for the purposes of the movie plot, the single orchestra and leader perform the functions of the two in the novel.
While there are many details of plot, character, locale and treatment in the movie which are obviously different from plaintiff's book, these cannot neutralize the similarities if the latter are actually present and are such as to justify the inference that there was copying. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49. We will, therefore, merely point out that there are these differences and give our whole attention to the alleged similarities.
In the book, Hubert is a handsome young violinist trained in the classics and showing great promise. The wealthy spinster, who sponsors him, and his music teacher hope to see him become a leading concert violinist. However, he has a natural liking for jazz and organizes a dance orchestra, much to the old people's disappointment. All of the foregoing is likewise descriptive of Roger in the movie. An early scene in both productions shows the young man giving a concert in San Francisco, sponsored by his wealthy patron. In the book, he is a soloist; in the movie, a member of a string quartette. At the conclusion of the concert, the violinist mingles with the audience and is surrounded by admiring, expensively-gowned ladies. In the book, Hubert mentions, in conversation with his teacher, the name of one of the selections he had played, "The Pizzicato"; in the movie, the teacher makes the comment that Roger must watch his pizzicato technique.
In the book, the girl, Zella, has composed a song, "Ditty Band", which later becomes a hit tune. Hubert's orchestra *429 plays this number and has difficulty with the rhythm the first time they play it. Zella suggests that they "Jass it, whoop it up a little", and when they do syncopate it, find it to be a very catchy number. Zella then sings her song to the orchestra's accompaniment. Later in the book, Zella meets Guido, an orchestra leader in New York, and finds he is featuring her song without permission. She is, of course, very angry, but later becomes friendly with Guido and sings with his band. In the movie, the girl, Stella, is the composer of the song "Alexander's Ragtime Band". Roger's orchestra, appearing at a night-club for a try-out, finds the music of this song on the premises and plays it without the composer's permission. The musicians read the music at sight but have difficulty, at first, with the rhythm. Suddenly, Roger indicates by his actions that he has sensed the proper rhythm and says "Look! I've got it! Just loosen up. Hit it!" The piece is then played as the composer intended and found to be very good. Stella appears on the scene and is very angry because of the unauthorized use of her song, but joins in singing the chorus. Her anger is later appeased and she accepts employment as a singer with the orchestra. After this episode, Roger adopts the name Alexander and his band becomes known as Alexander's Ragtime Band. The song, of course, is the musical theme of the picture and is used as a musical counterpoint to various dramatic episodes throughout the picture. This is true to a lesser degree of the song "Ditty Band" in the novel.
In the book there is a scene in which the music teacher pleads with Hubert to forsake jazz and follow classical music. The scene follows immediately after the concert scene referred to above. In reply to the professor's expression of disappointment at his interest in jazz, Hubert says that he likes jazz and hates to give it up, although he originally had had no intention of becoming a jazz musician. "`Very well', Professor Parisi said, `Good luck Hubert' and walked away in a discouraged manner." In the movie, Alexander's teacher visits the Ship Cafe, where his band is playing. In reply to the professor's argument that he has spent his whole life preparing for the concert stage and is throwing everything away for ragtime, Alex says that he likes ragtime and believes in it. The professor then says "You have your own mind. You always have" and exits.
In each production there is a love triangle involving the principal characters: in the book, the pianist, Lambert Waynemore, loves Zella, but steps aside when he realizes that Zella and Hubert love one another. The latter two marry, but later, when they are estranged through a misunderstanding, Lambert helps bring about their reunion. In the movie, the pianist, Charlie Dwyer, loves Stella. He steps aside, however, when he realizes that she is in love with Alex. Later, when Alex and Stella are estranged through a misunderstanding, Charlie marries the girl, but they are divorced and Charlie himself brings Alex and Stella together again. In the final scene, it appears that Alex and Stella will soon be wed. In each production, the unsuccessful lover composes a song to the lady and has it played for her as a means of expressing his devotion. However, a glance passing between the other two makes him realize that the girl's heart belongs to the other man. In each production this scene is developed by having the orchestra leader hand over the baton to the pianist and dance with the girl while the song is being played. They dance out onto the terrace and there, under the stars, realize the true depth of their feeling for one another.
Other scenes, similar in each production, further this thread of the plot. Lambert, in the novel, tells Zella that he knows she loves Hubert, and for her happiness he will step aside for the latter. She, with much emotion, admits her love for Hubert. Charlie, in the movie, tells Stella he knows she still loves Alex and that for her happiness he will grant a divorce. She, with much emotion, admits her love for Alex.
In the novel, Hubert learns that Zella is engaged to another and goes to a night-club to kill his despondency, accompanied by Willa, an entertainer with the orchestra, who attempts to cheer him up. Later, in a scene involving Zella, the marriage of two friends is being celebrated and Zella is told by Willa that the latter came near to marrying Hubert. In the movie, Alex is downcast when he learns of Stella's marriage to Charlie. He endeavors to drown his sorrow in drink. He makes a round of the night-clubs, accompanied by a member of the orchestra, and Jerry Allen, a girl singer with the orchestra; the latter attempts to cheer him up. Later, in a scene between Alex and Stella, the marriage of two of their friends is mentioned, and Stella *430 is told that Alex and Jerry almost decided to make it a double wedding.
The course of the two plots shows other similar scenes, although the sequence of events is not always the same. For instance, in each production there is a scene in which the girl singer dresses somewhat gaudily for an appearance with the band. The band-leader comes to her dressing room, comments scornfully on her attire and attempts to forcibly remove the baubles and embellishments which he considers to be in poor taste. In each there is a scene where a well-known entrepeneur of the entertainment world visits the place where the band is performing. The band-leader, hopeful of securing an engagement from that gentleman, instructs a waiter to serve him his favorite meal with the compliments of the management. The impressario has dinner, hears the band and the girl singer, offers the girl a job, but does not want the orchestra. Much to the leader's chagrin, the girl accepts the offer.
The first world war intervenes. In each production there is a recruiting scene in which a singer renders a song whose theme urges enlistment in the army. The band breaks up because many members enlist. The leader and his drummer both enlist and find themselves together as performers in the Army Show. There are corresponding scenes in which a sweater, evidently knitted by some mother or sweetheart, proves to be ridiculously small for the soldier who tries to wear it. There are corresponding scenes depicting the show put on by Army men. In the novel, the Army show includes an act in which a soldier clad in long underwear sings the author's own song "Don't Wake Me Up, Let Me Dream", while seated on the edge of a bunk. The same thing is told in the movie, with the difference that the song featured is Irving Berlin's "Oh, How I Hate To Get Up In The Morning". In each the girl goes to the Army show in hope of seeing the object of her affections, but cannot see him because he leaves for another post of duty immediately after the show. As he marches out of the auditorium, leading the band, she tries to call to him but he does not see or hear her.
Other scenes in the movie, which are reminiscent of episodes in the novel, include one in which the girl and one of the male characters see a mutual friend wheeling a baby carriage. They express surprise at the latter's being a father. He removes the covers and reveals the fact that he is carrying whiskey in the baby carriage (this, of course, occurs during the prohibition era). Another scene shows the girl on a train. A song, suggestive of her mood, is played on a portable phonograph. In the novel, the author has used her own composition entitled "Do You Remember"; in the movie, Irving Berlin's "Remember" is featured.
In the book, there is an episode in which Zella describes a dream she has had to her maid. In the dream, it seemed that she was married to Lambert. She is rehearsing in an empty theatre and looks out to see Hubert, just returned from the war, standing with a cane, looking at her picture in front of the theater. Lambert is backstage practising on the piano. She sees Hubert enter the theater and walk down the aisle toward her. They embrace and he expresses his love for her. She says, "Haven't you heard? Lambert and I are married". He makes some bitter remark and limps out of the theater. In the movie, there is a similar scene, although here it is not purported to be a dream, but portrays real action in furtherance of the plot. The time is after the war and the scene shows Alex leaning on a cane, standing in front of a theater which is advertising a show starring Stella. He goes in and finds her rehearsing on the stage of the empty theater, Charlie being backstage at the piano. Alex tells Stella he still loves her and then she breaks the news that she is married to Charlie for over a year. She says "Oh, I'm sorry  I  I thought you knew". Alex: "No, I  I didn't know." At this point, Charlie comes into the scene and invites Alex to have lunch with him and Stella. Alex refuses, showing by his speech and actions that the news of the marriage is a severe blow to him and that he is anxious to get away. He walks up the aisle, using his cane part of the way, then hooks it over his arm and finishes his exit.
In the book, there is an episode in which Zella takes a taxi to the Odeon, in San Francisco, to attend a concert given by Hubert. She alights at the auditorium entrance and, while the taxi waits, goes to the box office. On learning that the house is sold out, she returns to the cab. The driver remarks that when the wireless is perfected she will probably be able to listen to concerts right in the cab. After driving around for awhile, Zella determines to go to the stage entrance to try to see Hubert. *431 She finds her way to the wings of the stage and watches Hubert while he performs. Almost immediately following this episode, there is another involving a taxi: Zella, upon arriving at her destination, asks the driver the amount of the fare. "`Oh, a dollar will be enough' he replied. `A dollar', she exclaimed, `I thought it would be about twenty'. He smiled, `It would be to anyone else.'" In the movie, there is a scene in which Stella takes a taxi to Carnegie Hall to attend Roger's concert. The performance has already started and the driver tunes in the broadcast of the music on the radio in the cab. On arriving at the Hall, Stella asks what the fare is, and the driver replies, "One Dollar". Stella, looking surprised: "Is that all? Haven't we been riding more than ". The driver: "One dollar even, no more, no less." She pays and goes to the box office to buy a ticket, but is told the house is sold out. She goes out into the street again and finds the same cab waiting at the curb. The driver invites her to get in and listen to the concert on the radio as they drive around. After some colloquy, she accedes. When the performance of "Alexander's Ragtime Band" is announced on the radio, she leaves the cab and goes in the stage entrance of Carnegie Hall and walks to the wings where she can see Alexander. This is the final scene of the movie, showing Stella and Alexander reunited at the close of the concert.
Some attempt has been made to show sources, other than plaintiff's book, of the accused items. Darryl Zanuck, vice-president in charge of production of defendant corporation, testified that he conceived the idea of a motion picture based on Irving Berlin's song "Alexander's Ragtime Band", sometime in 1936. This idea was suggested to Berlin, who wrote a brief sketch, outlining the proposed show. We find none of the accused items in that sketch. Thereafter, various screen writers were employed as outlined above, writing eight different scripts in all. It is true that there is a gradual accretion of the accused items in the final movie version and we cannot point to any single script, or the work of any single author, as incorporating in a lump all of the copied portions. The evidence in behalf of defendant also attempts to indicate that one accused scene or another was the inspiration of one person, another scene that of another, etc. Nevertheless, the similarities outlined above are too numerous and too glaring to be the result of coincidence.
While the evidence before the court is such that we hesitate to point the accusing finger at any one of defendant's servants as being a conscious plagiarist, the appropriation of plaintiff's material, if any, may have been the result of a subconscious memory of one who read plaintiff's book, but that circumstance would not annul plaintiff's right to relief. See Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1, loc. cit. 16. This is not a criminal case, and intent is not a necessary element of the cause of action. Meccano v. Wagner, D.C., 234 F. 912; Fisher, Inc., v. Dillingham, D. C., 298 F. 145; Sheldon v. Metro-Goldwyn Pictures Corp., supra. Nor are we satisfied with the further explanation that much of the accused material is the stuff of common human experience and, therefore, cannot be said to be plaintiff's original creation. It is true that most fictional literature attempts to hold the mirror up to life; as Palladas remarked long ago, "All life is a stage and a play" and anyone may draw on human experience and may simulate human experience by creating episodes which suggest reality. But the author's treatment is his own exclusive property and is protected by the courts. Hartfield v. Peterson, 2 Cir., 91 F.2d 998; Detective Comics v. Bruns Publications, 2 Cir., 111 F.2d 432, 433; Wilkie v. Santly Bros., 2 Cir., 91 F.2d 978, 979. We think this is a case where plaintiff's treatment has been consciously or unconsciously purloined.
The similarities show more than a mere adoption in the movie of the same theme, plot or idea as the one on which plaintiff's novel is based. There is more than the use of similar stock characters or situations in the two productions. While the dialogue is, in none of the instances which have been called to our attention, identical, we do not understand the law to be that literal copying is necessary to constitute infringement. Dam v. Kirk La Shelle Co., 2 Cir., 175 F. 902, 41 L.R.A., N.S., 1002, 20 Ann.Cas. 1173; Fleischer Studios, Inc., v. Ralph A. Freundlich, D. C., 73 F.2d 276, certiorari denied 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250; Nutt v. National Inst., 2 Cir., 31 F.2d 236, 237; Sheldon v. Metro-Goldwyn Picture Corp., supra. It is self-evident that some change is necessary when a literary production is transposed from one medium to another, and further change than that made absolutely *432 necessary by the transposition is often advisable in order to obtain the best possible effect in the new medium. Furthermore, we deem it well within the realm of possibility that a professional writer or dramatist can considerably improve the work of an amateur and still be a plagiarist. The degree of change requisite to avoid the judgment of copying and to justify rather a conclusion that there has been only a fair use of the original material varies with the circumstances in each case. We have to compare here a novel written by an amateur and a movie prepared by professionals whose skill is reflected by their substantial incomes. A satisfactory test for this comparison is that of the impression of the ordinary observer: Would he think the movie to be a picturization of the novel? Nichols v. Universal Pictures Corp., D.C., 34 F.2d 145; King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533; Dymow v. Bolton, 2 Cir., 11 F.2d 690; Barbadillo v. Goldwyn, D.C., 42 F.2d 881; Wite-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann.Cas. 628; Kustoff v. Chaplin, 9 Cir., 120 F.2d 551. The court, in its role as the trier of fact, has read the novel and has seen the movie, in addition to having had the opportunity of examining the various scripts and conference minutes from the files of defendant motion picture company. Speaking from the standpoint of one who has seen the movie and read the book, we are of the opinion that the ordinary observer would take the movie to be a picturization or dramatization of plaintiff's novel, as evidenced by the portions described above. From this we infer that the defendants or their agents have copied plaintiff's work and have, therefor, had access to it.
For further defense, defendants charge plaintiff with laches, citing Remington-Rand v. Acme Card System Co., D.C. Ohio, 29 F.Supp. 192. In that case, the court denied any relief for patent infringement because plaintiff's delay in bringing suit resulted in defendant over a period of many years making a large investment for production and sale of the infringing device and made it inequitable for plaintiff to have either an injunction or an accounting because of the infringement. The theory is similar to that of estoppel. Plaintiff, knowing defendant's circumstances, has, by his lack of diligence in asserting his rights, induced defendant to act and change his position in reliance on the belief that he will not be called to account. Had plaintiff acted with reasonable promptness, defendant would, of course, be required to pay for his wrong, but where plaintiff is guilty of laches, his own wrong is grounds for denial of any relief in a court of equity. In Keystone Macaroni Mfg. Co. v. Arena & Sons, D.C.Pa., 27 F.Supp. 290, an injunction restraining trade-mark infringement was granted, but an accounting was denied, where plaintiff allowed a period of three years to lapse between its discovery of infringement and its filing suit. The evidence showed that during the intervening period defendant had invested additional capital in furtherance of the accused trademark.
While the rule of the two cited cases is unquestionably sound (Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526) and applies, in a proper case, to litigation over a literary copyright as well as to litigation over trade-marks and patent, the facts of the case before the court do not show laches on plaintiff's part. Plaintiff was first aware of the nature of defendant's movie when she saw it at a regular public showing. The production of the picture was complete and it remained only for it to be exhibited. Plaintiff waited some two years from the time she first charged defendants with plagiarism until she filed suit, and she did not exhibit a copy of her novel to defendants until after the commencement of litigation. However, the delay was partly caused because of plaintiff's difficulty in securing counsel, and we think this circumstance excludes any inference of negligence or deceitful conduct on her part. Secondly, we cannot in this case see where defendants have suffered any injury by the lapse of time. Exhibition of the picture had already begun when plaintiff first made her accusation; the expenses of producing the movie had already been incurred, and after that its continuing public exhibition made it possible for defendants to recoup their investment. Mere acquiescence on plaintiff's part is insufficient to defeat enforcement of plaintiff's rights. Menendez case, supra.
Plaintiff is entitled to an injunction, enjoining and restraining defendant from infringing plaintiff's said common-law copyright; and for such damages as plaintiff may be shown to have suffered, and for an accounting of such gains and profits defendant has derived from its infringement *433 of plaintiff's common-law copyright, and for costs. An interlocutory decree in accordance with the views herein expressed will be entered. Counsel for plaintiff will submit findings of fact and conclusions of law and a decree, submitting same to defendant's counsel.