## McCONNOR v. KAUFMAN et al.

District Court, S. D. New York.
March 12, 1943.

Howard E. Reinheimer, of New York City (Irving Cohen, of New York City, and Lee Moselle, of counsel), for defendants George S. Kaufman and Moss Hart.

Robert W. Perkins, of New York City (Joseph D. Karp and Stanleigh P. Friedman, both of New York City, of counsel), for defendant Warner Bros. Pictures.

Weil, Gotshal & Manges, of New York City (Horace S. Manges, of New York City, of counsel), for defendant Random House, Inc.

O'Brien, Driscoll & Raftery, of New York City (Benjamin Pepper, of New York City, of counsel), for executors of estate of Sam H. Harris.

GALSTON, District Judge.

This action accuses "The Man Who Came to Dinner", a very successful comedy played on the stage in New York City and elsewhere in the United States, produced also as a moving picture and published as a book, of infringement of plaintiff's copyright in an unpublished and unproduced play entitled "Sticks and Stones", the copyright title of which was "The Murder Issue". Of the defendants named, George S. Kaufman and Moss Hart were the playwrights; Sam H. Harris, deceased, had presented the play on the stage; Random House, Inc., had published the play; and Warner Bros. Pictures, Inc., had produced the motion picture. James Monks, named as a defendant, is alleged to have been a co-owner of the plaintiff's play, but since the filing of the complaint has assigned all his right, title and interest in and to the copyright to the plaintiff. It is conceded that the defendants stand or fall with the determination of the issue of infringement.

The material allegations of the complaint are denied and Kaufman and Hart also deny that either of them had read plaintiff's play or copied any part thereof.

It will suffice to adopt as descriptions of the two plays the summaries given by the plaintiff when testifying before trial. He said of his own play:

"It is the story of Wainright, a famous radio columnist and writer, who is working on a book with his friend who is the editor of a magazine. They are working in Wainright's apartment. His servant is a man named Herbert. The other members of the staff of the magazine begin to come into the apartment for a meeting to decide upon a form for a novel edition of

Harry Weinberger, of New York City (W. E. Aronberg, of New York City, of counsel), for plaintiff.

the magazine. Among those are Paula Harper, Freddie, Steve, George Solomon, the music critic, and Homer Adams, the art editor. The first act is a creation of this special edition of the magazine with the various members of the staff coming in. It develops that all of the staff members know a well-known actress, named Stella Morgan. She is the sister of Freddie. She has been seen with Steve with whom Freddie is in love. She is involved with all the other members of the staff in one way or another. During the conference, various suggestions are given as a title for the special issue of the magazine. Through this, the servant, Herbert, keeps reappearing, serving drinks, etc. Paula Harper arrives with her husband who has been drinking too much and who has been in a fight. The mumbling of this character in which he says that he will murder someone brings up the idea of a special issue on murder and they decide to call the issue a murder issue. At this point, a detective comes in with a policeman announcing that Stella Morgan has been murdered and that Steve is suspected of the murder, which is the curtain of the first act.

"The second act begins at a radio broadcast by Wainright. This broadcast is a satirical speech in which Wainright closes the broadcast and an announcer reads the commercial. This broadcast is given from his apartment because Wainright has an injured leg and is unable to move from the sofa. At the end of the broadcast, Freddie and Steve and other characters begin to come into the apartment. It develops that Steve is still suspected of the murder, but has been allowed his freedom and the police are trying to solve the mystery. The magazine material has turned out to be a complete flop and the various editors have to rewrite their material before the magazine comes out. During the act, it develops that every character has been even more thoroughly involved with Stella Morgan than was previously known. She had been seen with most of them and Freddie becomes very jealous of Steve's attitude toward Stella before she died. The police have still not solved the murder and Wainright is resolved that he is going to. His injury is a fake. He has used it to get the radio broadcast and these people to his apartment, which his servant knows. The detective, Duffy, comes to the apartment and questions Wainright, implying that he is suspicious of him. All the

other characters leave after recriminations among all of them. Leaving Wainright with the detective and his servant, Herbert, it develops that the detective remembers having seen the servant some place and Wainright discloses that he was an acquitted hatchet murderer. The detective leaves and Wainright gets to his feet. He then prepares to leave with Herbert on an errand which he hopes will solve the mystery, ending the second act.

"In the third act, Wainright is back at his apartment, the same night. Some of the other characters begin to return, saying that they have been working with Madison trying to save the murder issue. It develops that Wainright has discovered the murderer and expects him to come to the apartment. Several of the characters return, including Louise, the fashion expert, and finally the murderer comes— Homer Adams. Wainright persuades him to dictate a confession which he does. The murderer then tries to force Wainright to sign the confession, planning to shoot him after he does so. At this point, the police arrive but before they get in Wainright convinces Adams that he should escape to his summer home on an island in Nova Scotia and after convincing Adams that he is not trying to catch him, Adams agrees to catch the train and leaves. The police break in and arrest Wainright for the murder of Stella Morgan. Paula Harper also arrives and Wainright tells her that the murderer's confession has been recorded on the equipment which was earlier used in his broadcast and she can obtain these records from the broadcasting company the next day. They are to be used as a scoop in the murder issue of the magazine. The play ends with the police taking Wainright off to jail. That is the curtain of the last act."

Of the defendants' play his summary recites:

"It is the story of a radio personality— a writer—who is visiting a town somewhere in the Midwest and while having dinner with some of the local people, slips and breaks his hip. He is confined to the house during his convalescence and to the house come various of his friends. In the house is a middle-aged, married couple, with two children and a sister of the husband, whom Whiteside vaguely remembers. The play is a series of visitors from New York and London, including a famous actress, a man who plays the piano, a Hol-

lywood actor. With Whiteside is his secretary, who falls in love with a reporter actually the owner of the local newspaper, who has written a play. During Whiteside's stay at this house, he realizes that his secretary is in love for the first time and that he will have to break it up to keep her as his secretary. He uses the various visitors who come to see him to break the romance. He does his Christmas broadcast in the house as a result of being held there by his injury. This injury it develops is not a real injury. The doctor had read the wrong X-rays and he can get up and walk around, which he does.

"Whiteside sends for a famous actress knowing that she is looking for a play and that the play the newspaper man has written can be a vehicle for her. This he hopes will break up the romance between his secretary and the newspaperman. The actress arrives. The plan works successfully. The secretary, however, is really·in love with the newspaperman and when Whiteside discovers this, he regrets having mixed up the affair. He then proceeds to get rid of the actress by shipping her off in a mummy crate.

"Meanwhile, the people in the house have been trying to get rid of him and after several weeks of warning that he must be out that day or they will have sheriffs put him out. Just as the sheriffs arrive, Whiteside remembers where he has seen the face of Mr. Stanley's sister. She was a famous and acquitted hatchet murderer. Using this, he forces Stanley to leave him alone, but now that the secretary and her newspaperman are happily engaged, he is free to go and starts off again back to New York ostensibly. He falls down the steps and is brought back this time apparently with a broken hip, which ends the play."

█ From these summaries, and more particularly from a reading of the two plays, it appears that the plaintiff's is a mystery play, the defendants' a comedy. The two plays have in common the character of Alexander Woolcott, a well-known dramatic critic, book reviewer and radio monologist. In "Sticks and Stones" he is the Wilmer Wainright, a member of the staff of "The Manhattan". In the defendants' play he is Sheridan Whiteside. At the trial Woolcott was described as an individual of varied interests, of many social facets, and unpredictable alike in utterance and mood. The plaintiff seized upon Woolcott's interest in mystery murders and accordingly built up his drama around the mystery involved. In a somewhat conventional way suspicion is directed first to one and then to another of "The Manhattan" group. Rather cleverly the confession of the murderer is obtained with the aid of a concealed recording disc. The purpose of the broadcast scene thus is not only to bring the group to Wainright's apartment, but more particularly to enable the installation of a dictaphone by means of which the murderer may be trapped.

To a widely different theme, the defendant playwrights contribute a far richer delineation of Woolcott's character. Without unfairness, perhaps it could be said that the plaintiff's Woolcott is static, whereas that of the defendants is dynamic, passing through various stages from offensive irrascibility to temporary gentleness and contrition. The plaintiff was at a disadvantage in never having met Woolcott. So he had to build his character on knowledge within the public demesne. On the other hand, Kaufman and Hart were intimate friends of Woolcott. Hart had known him for thirteen years and Kaufman for twenty-five years. As joint owners with Woolcott of a camp in Vermont, they had lived under the same roof. They frequently visited his home, as he did theirs. They belonged to the same social coterie. Their opportunities for personal character study were in consequence far superior to those of the plaintiff. So it is easy to understand that the Wainright of "Sticks and Stones", though three-dimensional, does not leap from the page as does the Whiteside of "The Man Who Came to Dinner".

The character delineations are explainable also on other grounds. In the plaintiff's play Wainright is not always the focal interest; but there is no moment in "The Man Who Came to Dinner" during which Whiteside fails to rivet attention. The nature of the plots also affords explanation of that contrast. As is common expedient in mystery drama, the focus of attention through the medium of diverted suspicion is directed to various persons by the employment of the not unfamiliar ruse of true and false alibis. The Woolcott personality is in no way essential to the development of the plaintiff's play. As a mystery play, any of the well-known fictional detectives would have carried out the solution of the murder without loss of in-

terest in the play. But in the defendants' play no substitution of character could have been effected without a breakdown of the play. Almost an equation was established by the playwrights of "The Man Who Came to Dinner". Whiteside was Woolcott. Other evidences of this fundamental difference in the plot structure and characterizations are not hard to find. In the plaintiff's play there are sub-plots; there is the desire of the publisher of "The Manhattan" to get out a novel issue to increase circulation of the periodical; there is the effort to write a new mystery play; there is threatened blackmail to account for the murder. None of these sub-plots radiates from the character Wainright. In the defendants' play there are no sub-plots except such as are developed by Whiteside himself. The evident purpose of the playwrights was to use these sub-plots for the sole purpose of revealing the personality of Whiteside. In "The Man Who Came to Dinner" we find a development evidencing an original and varied background. The characterization is kaleidoscopic, as apparently was Woolcott, the man. One gets no such visualization from the reading of the plaintiff's play. Indeed it is not too much to say that given the plaintiff's play, one could read it from cover to cover and study it to the proverbial doomsday without drawing the slightest suggestion of the plot, setting, sequence, dialogue or dramatis personae (Wainright alone excepted, but not with anything like the development of the defendants' treatment) of "The Man Who Came to Dinner".

That leads to the discussion of the question of access. The proof discloses that the plaintiff, through the medium of a play-broker, caused his play to be submitted to Kaufman some time early in 1936. This press agent, Arthur Levy, asked Kaufman to read the script. Kaufman handed the play to his secretary, Myra Streger, and requested her to read it. After she had reported orally, Kaufman wrote a letter, which bears no date, to Levy, wherein he said that he thought the play "pretty good, but there is just nothing I can do about it. I have to work on my own things * * *; twice this season I dabbled in outside shows and each time they ran a week. So I am cured, for the present at least.

"Specifically, I think the Woolcott character is fine, but Ross is rather dull—too much whining and prodding. The scenes in which he is involved seem repetitious. Also the general swinging of the finger of suspicion in Act Two is somewhat conventional and not always sufficiently motivated.

"But it is pretty good, and I don't know why somebody should not put it on with you. It just cannot be me and I regret it.
"George".

Both Kaufman and Hart deny that they had read the play. Mrs. Streger had read it, and she was present when Kaufman typed the letter to Levy. Indirect access, therefore, was established, at least so far as Kaufman was concerned. Despite the similarities, which will presently be discussed, I accept his testimony and Hart's that they had not read "Sticks and Stones", though it may be that Mrs. Streger's oral report to Kaufman was a more detailed review than she was able to recall at the trial. Mrs. Streger explained, and Kaufman himself testified, that he was not interested in putting on mystery plays, for they offered no lure of financial success. It is significant that after the Kaufman rejection there was no production or other publication of the plaintiff's play. Two years elapsed before the defendants began the writing of their play. The origin was plausibly explained by Hart. It seems that Woolcott had visited Hart's home in Bucks County, Pennsylvania, in December, 1937, and had proved himself a thoroughly disagreeable visitor. At the conclusion of the visit he inscribed in Hart's guest book, under date of January 3, 1938, this comment:

"This is to certify that, on my first visit to Moss Hart's manor house I had one of the most unpleasant evenings I can recall ever having spent.
"Alexander Woolcott."

To which there is appended a post-script, written by Moss Hart:

"Through no fault of mine—Mr. Woolcott was drunk and Max Gordon was here."

Following that visit Hart discussed with Kaufman Woolcott's behavior at his home and Woolcott's desire to have a play. Thus they saw the possibility of writing a play which revolved about Woolcott himself.

Assuming for the moment direct and not merely indirect access, what is the evidence of copying? The plaintiff points out certain similarities, and correctly, but as will be observed they are of a minor

nature and only superficially alike. For example in both plays we find a line referring to calves' foot jelly—a time honored gift to an invalid. Then there is the matter of baby talk by the Woolcott characters. However, as was explained by Hart, this was one of Woolcott's irritating weaknesses. It was apparently known to the public as well as to his intimates and is made use of in "Entirely Surrounded", a novel written by Charles Brackett. That book, it may be observed, in addition to having Woolcott recite a favorite jingle of Woolcott, "I'se des a ittle wabbit", etc., which is recited by Whiteside, is a vivid portrayal of Woolcott in all his moods. It was published in 1934, prior to the plays of both plaintiff and defendants, and Hart testified that he had read "Entirely Surrounded" shortly after its publication. Equally available to the public was "Brief Moment", a play by S. N. Behrman and published in book form in 1931, The cast of that play includes one "Harold Sigrift * * * very fat; * * * and lies down whenever possible. He somewhat resembles Alexander Woolcott, who conceivably might play him." Other Woolcottian traits depicted in defendants' play may be found in Behrman's play. Both Brackett and Behrman had been friends of Woolcott.

 Thus the defendants had access to material which served them far more abundantly than access to the plaintiff's play. The matter of public demesne is in consequence important. See Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, at page 54.

Thirdly there is the device of a feigned injury. Whiteside's injury, however, was not feigned. He had fallen on the ice and sustained an actual injury. It cannot be argued that because the doctor's original diagnosis was disproved by a subsequent reading of an X-ray plate, Whiteside had not suffered pain and discomfort sufficient to keep him in a wheeled chair for a time. That situation is quite different from the injury feigned by Wainright and designed by him to throw suspicion on himself as the murderer of Stella Morgan.

Again, plaintiff makes much of the adoption by Kaufman and Hart of the radio broadcasts from the Stanley home, because the same instrumentality is employed in "Sticks and Stones". Even here, however, the plaintiff fails to show copying because the testimony establishes that Woolcott, while he was a patient at the Doctors' Hospital, had on at least two occasions broadcast from his room in that institution. Moreover, even as a stage device it was not new with the plaintiff, but had been known to and actually used by Kaufman in several of his earlier plays.

Not so readily explainable are the similarities found in the use by the defendant of the names "Ginger Rogers", "Tiny Tim", "Lord Fauntleroy" and "Florence Nightingale", except as one might find a sufficient explanation in the text itself. Just why Ginger Rogers, famous as she is as a moving picture actress, was hit upon in both plays, is not clear. The reporter who, in Scene 1 of the plaintiff's play, seeks her, might just as well be looking for any other moving picture actress. The name is used, I believe, only once in each play. Likewise in defendants' play, the name of any well-known actress could have been used with equal effect. Indeed, in the so-called final script of defendants' play her name does not appear. In a closely related passage almost immediately following, Whiteside refers to "Martha Raye", also a well-known screen actress. Nevertheless it is to be noted that just as the name "Ginger Rogers" did not appear in the final script of "The Man Who Came to Dinner", neither does the name "Little Lord Fauntleroy". It may be observed that Hart was doubtless in error in testifying that Defendants' Exhibit C was their final script, for in addition to the variations heretofore noted between the final script and the alleged infringing play, the dialogue between Whiteside and Maggie in Act One, Scene 1, relating to the cablegram Whiteside has received from Beverly Carlton, differs in the two versions.

As to "Tiny Tim", in the plaintiff's play, in the second scene of Act One, during the discussion among the members of the staff of "The Manhattan", Madison, the publisher or editor, says: "Damn the lot of you!" and Wainright adds: "Said Tiny Tim". Just how meaningful that observation was is doubtful. In "The Man Who Came to Dinner", in Act Three, after Christmas greetings have been expressed by Dr. Bradley, Bert, the young newspaper man, exclaims "God bless us all and Tiny Tim". This at least has some meaning, since one inevitably associates "Tiny Tim" with the Christmas celebration.

I believe the only reference to Lord Fauntleroy in the plaintiff's play is that

in which Paula, an associate editor of "The Manhattan", says to her inebriated spouse, Jerry, also an associate editor of "The Manhattan": "Take it easy, Lord Fauntleroy! You're covering a show tonight." In the defendants' play, Maggie, Whiteside's secretary, delivering a tongue lashing to Whiteside for his interference in her love affair, concludes the tirade with: "That's my message to you, Big Lord Fauntleroy." [1]

A reference to "Florence Nightingale" is made by the defendants as well as by the plaintiff. But it must be remembered that "Tiny Tim", "Florence Nightingale" and "Lord Fauntleroy", when used as rhetorical personifications, though they might well predicate access, are in themselves not copyrightable, and their adoption by the defendants in totally different settings from the rather pointless use of the plaintiff, falls far short of "copying" within the law of copyrights.

Again, in the final scene of "Sticks and Stones" Paula says to Wainright as he is arrested for the murder of Stella: "We'll get you out! We'll get Max Steuer". In defendants' play, in the very beginning of the play, Whiteside, asked about his condition by Stanley, replies that he is suing for $150,000. Whereupon Mrs. Stanley exclaims: "You mean because you fell on our steps, Mr. Whiteside?" to which he responds: "Samuel J. Leibowitz will explain it to you in court. * * *. In both plays also there is a reference to a "hatchet murder". Duffy, the detective in "Sticks and Stones", says to Herbert, Wainright's butler: "I have seen you some place before * * * been trying to place your face for over a week." In "The Man Who Came to Dinner", Whiteside, on meeting Harriet Stanley, the sister of his host, exclaims: "You know, I have seen that face before somewhere." Herbert, so it developed, had been accused of a "hatchet murder" as had Harriet Stanley. The two incidents are, however, used for totally different purposes in the two plays. In "Sticks and Stones" the situation is of interest only as pointing out another possible murderer. In "The Man Who Came to Dinner", Whiteside's memories are finally sufficiently stirred to enable him to identify Harriet Stanley as the woman who had

murdered her parents with an axe twenty-five years before. This was apparently not known to the Mesalia community in which the Stanleys lived, and Whiteside's identification enables him to compel Stanley to call off the officers whom Stanley had summoned to eject Whiteside from his home. In this connection it may be mentioned that Woolcott was known to have had an absorbing interest in the famous Lizzie Borden murder trial in which the defendant was accused of slaying her mother and father with a hatchet.

The defendants are charged also with having used the mechanism of the love triangle. Whiteside's secretary and the young newspaper man are indeed in love with each other, but there is nothing to indicate that Lorraine Sheldon has any affection for the young man, nor the young fellow for her. Lorraine's activities were wholly instigated by Whiteside. In the end the whole incident serves as a means of portraying first the selfish, conceited, exhibitionist phases of Whiteside's character, and then his gentler nature. In the plaintiff's play, the triangle is wholly unrelated to Wainright and at best is but faintly indicated. It serves only to point the finger of suspicion at another candidate for the roll of murderer.

In sum, these similarities are of the most trivial nature and even when they occur are not in the same setting. Judge Mayer observed years ago in Stevenson v. Harris, D.C., 238 F. 432, 436: "It will never do to hold that, because an incident here or there is used in the later production which was used in another relation and situation in the former copyrighted book or play, therefore the later production infringes the copyright of the former." See, also, Bein v. Warner Bros. Pictures, Inc., 2 Cir., 105 F.2d 969; Nichols v. Universal Pictures Corporation et al., 2 Cir., 45 F.2d 119.

Even on the assumption that all of the suggested similarities stemmed from the plaintiff's play, there remains such gross dissimilarity in all the other aspects of the two plays, particularly in the important subjects of theme, dialogue, setting and sequence, as to defeat the charge of substantial copying. Without such evidence plaintiff must fail. Dymow v. Bol-

---

[1] This quoted sentence does not appear in the final script of defendants' play, Defendants' Exhibit C.

ton, 2 Cir., 11 F.2d 690; Frankel v. Irwin et al., 2 Cir., 34 F.2d 142; and Carr v. National Capital Press, Inc., 63 App.D.C. 210, 71 F.2d 220. The ordinary reader would find no connection between the two plays. Bachman v. Belasco, 2 Cir., 224 F. 817. And the ordinary observer rule is an accepted test. Nichols v. Universal Pictures Corporation et al., supra; Dymow v. Bolton, supra; Frankel v. Irwin et al., supra; Carr v. National Capital Press, Inc., supra; and Kustoff v. Chaplin, 9 Cir., 120 F.2d 551. However, neither the ordinary observer nor the keenest critic could recognize "The Man Who Came to Dinner" as a reproduction or copy of "Sticks and Stones". It would take more than a play doctor to transmute one into the other. White-Smith Co. v. Apollo Co., 209 U.S. 1, 17, 28 S.Ct. 319, 323, 52 L.Ed. 655, 14 Ann. Cas. 628, wherein it is said: "What is meant by a copy? We have already referred to the common understanding of it as a reproduction or duplication of a thing. A definition was given by Bailey, J., in West v. Francis, 5 B. & A. 743, quoted with approval in Boosey v. Whight, supra [80 L.T.R. 561]. He said: 'A copy is that which comes so near to the original as to give to every person seeing it the idea created by the original.'" See, also, King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533.

In passing it may be observed that there are differences between plaintiff's copyrighted play and the version submitted to Kaufman. Scene 1 is set in Stella Morgan's apartment in the copyrighted play, whereas in the altered version, Scene 1 is in the bar of "21". The copyrighted version does not disclose Wainright as a non-alcoholic, as does the latter, nor is there a love triangle in the copyrighted play. Neither "Tiny Tim" nor "Steuer" is mentioned in the copyrighted version. The copyrighted play makes it clearer, if that were necessary, that the main purpose of the radio broadcast from Wainright's home was to enable him to conceal the microphone and thus make a permanent record of the murderer's confession.

However, "The Man Who Came to Dinner" infringes neither the copyrighted version nor the play submitted by the plaintiff to Kaufman. Accordingly the complaint will be dismissed with reasonable counsel fees and costs. On the subject of what are reasonable counsel fees, counsel will be heard at the time that the proposed decree is submitted. There will be filed separately findings of fact and conclusions of law in conformity with the foregoing opinion.