## TWENTIETH CENTURY–FOX FILM CORPORATION v. DIECKHAUS.

### No. 13121.

Circuit Court of Appeals, Eighth Circuit.

Feb. 25, 1946.

Rehearing Denied March 25, 1946.

JOHNSEN, Circuit Judge, dissenting.

———◆———

John Fletcher Caskey, of New York City (Samuel W. Fordyce, George T. Priest, and Thomas W. White, all of St. Louis, Mo., and Edwin P. Kilroe, of New York City, were on the brief), for appellant.

J. Porter Henry, of St. Louis, Mo., (John Raeburn Green and Robert D. Evans, both of St. Louis, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

In her complaint in this action the plaintiff accused the defendant film corporation of copying her unpublished and uncopyrighted book "Love Girl" without her consent in the production and presentation by defendant of its sound motion picture "Alexander's Ragtime Band." There was jurisdiction by reason of diversity of citizenship and amount involved, and on the trial of the issue joined the court entered interlocutory decree in favor of the plaintiff awarding an accounting for damages and profits and injunction against further exhibition of the picture. Dieckhaus v. Twentieth Century Fox, D.C., 54 F.Supp. 425. There was no extraneous evidence that defendant had ever had access to the plaintiff's book prior to the exhibition of its picture on August 19, 1938, and there was direct evidence that it had had no access thereto, but the court found from comparison of the book with the picture that there were similarities which could not be the result of

coincidence and which, therefore, were the result of access to the book by defendant and of "conscious or unconscious" copying thereof.

It recognized as the parties here agree, that in law the unauthorized copying of the whole or substantial part of the literary property of another is a tort and that in an action such as this the burden of proof to establish the commission of the tort was upon plaintiff. Also that the law of literary property and copyright, differing from patent law, protects the property right of the originator of a composition, even though the composition he has originated is the same as that which another has originated. Each originator has property right in his own and the action does not lie unless the defendant had access to the plaintiff's work and copied therefrom. But as summarized in its written opinion, included in the record, the court inferred from the existence of similarities which it found "that this is a case where plaintiff's treatment has been consciously or unconsciously purloined."

The defendant prosecutes this appeal to reverse the decree and contends, among other things, (1) that the court erroneously applied the doctrine of unconscious plagiarism and that upon proper application of the law relating to access and copying to the evidence before the court, the defendant was entitled to a finding that it had not had access to the plaintiff's book and to dismissal of the action. It also contends (2) that the plaintiff in the prosecution of her action practiced fraud upon the court in connection with documentary evidence introduced by her to sustain her claims and therefore is not entitled to relief in equity. These contentions present the only substantial questions for decision here.

(1) The trial court recognized in its findings that the defendant had adduced the testimony of witnesses and documentary evidence tending to show that its named servants acting in its behalf originally composed and produced Alexander's Ragtime Band, and that "each of them denies having ever seen or heard of plaintiff's story or knowing plaintiff or any of the literary agents mentioned above (referring to a Mrs. Malone and a Mr. Laurence R. D'Orsay, to whom plaintiff had entrusted her book for brief periods for criticism)", but immediately following, in the findings, the court said: "Nevertheless access may be inferred from similarity between the two works as stated above and we will there-fore, proceed to an examination of the alleged similarities between the novel and the movie."

The court did not find any of the particulars testified to by any of defendant's witnesses or reflected in its documents, to be false, but concluded that the similarities revealed by the comparison of the book with the picture established defendant's "conscious or unconscious" plagiarism of specified parts of the book.

The evidence as to the production of defendant's picture shows that Mr. Zaryl Zanuck, production vice president of defendant, originated the idea of making a picture to be called "Alexander's Ragtime Band" (that being the title of Irving Berlin's earliest great song hit success) reflecting the life of Berlin which would present the playing and singing of, and dancing and acting to his famous songs. He broached the matter to Mr. Berlin in 1936 while Mr. Berlin was in Hollywood working under contract with defendant on another picture. Berlin "had done a cavalcade of his songs on the radio" and at or about the time of Zanuck's suggestion a "cavalcade" of Berlin's songs was being presented to the public over the radio to which "the reaction was a very enthusiastic one." Berlin accordingly responded favorably to Zanuck's suggestion to put the music on a screen production under the title Alexander's Ragtime Band, with the qualification that he (Berlin) should not be pictured as the hero, but that the hero should be a fictional character, a composite of several men identified with the rise of Jazz music, and he applied himself for a month or more to composing an outline for the picture which would tell with the music the story of what he and those in this field of music regard as American music during the period of his conspicuous activity in that field. He completed the outline and had it typed by his secretary in October, 1936. The outline as he wrote it, is entitled Alexander's Ragtime Band, and is a story of a fictitious "Alexander" and of his jazz band and of the steps through which the band and the kind of music it played advanced from gaining the attention and approval of small and lowly audiences until, as the climax of the story, it was acclaimed by most critical and conservative authorities in music at an historical performance in New York at Carnegie Hall. Study of the outline and the testimony concerning its composition and

the use made of it after it was submitted to Zanuck in December, 1936, convinces that it included the substance of the musical plotting of the final production and was closely adhered to throughout the period devoted to the work of producing the picture. It had its historical basis in the lives of Berlin and his intimates, Whiteman, Gershwin and others. Berlin appended a note to his outline stating that it was merely his attempt to put down on paper an idea of a story around "Alexander's Ragtime Band" title and character; that the love story had not been developed and that he had made no effort to "cue any musical spots other than the old songs that are tied up to the story."[1]

After Zanuck received the outline from Berlin and approved it, they proceeded with the project and Berlin testified as to his

[1] The New York Times and the metropolitan newspapers generally throughout the country published full synopses of Alexander's Ragtime Band during August of 1938 and a great volume of magazine and news accounts of it are readily accessible in the publications of that year. We do not set it out in our opinion. Synopsis of Berlin's Outline of October, 1936 (defendant's), is as follows:

"A five-piece band in which George Stephenson is the clarinet player is playing in a cheap saloon. George lives with his mother who does not approve of his playing in the band. The bartender hands to the leader of the band, as part of his mail, an orchestration of Berlin's 'Alexander's Ragtime Band' which has been sent by a New York publisher. The piano player of the band runs over the number but they do not like it and the leader discards it. But later a well-dressed customer in the saloon asks a waiter to have the band play 'Alexander's Ragtime Band'. The band retrieves the music but cannot play it well. George then commences to improvise and the music makes a hit with the patrons. The leader, however, disapproves and fires George.

"George returns home to his mother and, despite her objections, declares his determination to have a ragtime band of his own called 'Alexander's Ragtime Band' and adopts the name 'Alexander' for himself. Alexander forms his band, which works its way up from a honkytonk saloon to a cabaret and finally to a fine casino. Through these episodes Berlin numbers are played to show the historical development of jazz music.

"Then follows a scene where Alexander is headliner at an Orpheum Theatre where Peggy Howard, a pretty singer, is an early act. Peggy introduces herself to Alexander and makes a play for him, but he discovers that the reason for this is that she sings 'Alexander's Ragtime Band' as the opening number of her act and she doesn't want Alexander to use the song. He insists and she has to use another song which spoils her act; they quarrel.

"In 1917 Alexander is playing in a San Francisco cafe and has a piano player who does a specialty. His band is famous and Hammerstein wants him to go to New York. The war comes along and Alexander is drafted. At Camp Upton Irving Berlin organizes an army show and gets Alexander to lead its orchestra. On the day of the opening, orders to leave for France are received. The show goes on, however, and Berlin sings 'Oh, How I Hate to Get Up in the Morning.' At the end of the show, the orchestra and the cast march out and down the street on their way to France.

"The next scene finds Alexander in 1920 returned to New York from the war and out of a job. Ragtime has gone and the era of jazz has arrived. Alexander goes to Berlin for help. Berlin is writing a new Broadway show and is in the midst of rehearsals. Alexander goes to the theatre and from the pit looks up into the face of Peggy Howard who has become famous and is the female lead in the show. She has forgiven him but Alexander is too proud to stay. He leaves and organizes a band of old ragtime musicians which plays in a small night club and becomes successful.

"Alexander begins to dream of a big concert at Carnegie Hall. A playboy arranges for a Carnegie Hall concert for Alexander. He sends for his mother and sister to come to New York for the concert. On the concert night Alexander leads the symphony orchestra in an arrangement of 'Alexander's Ragtime Band.' Peggy is in the audience, very moved, and after the curtain she rushes backstage and the story ends happily."

Plaintiff's book does not lend itself to any synopsis within reasonable compass. It has not been put together in accord with any definite plot. It has many pages of expressions of sentiment in prose and in short lines without end rimes, narrates many occurrences, including, inter alia., a murder, suicide, "alienation suit," many love affairs, licit and illicit, automobile accidents, etc. and brings in lawyers, deaths, wills, legacies, birth of a baby and its kidnapping, fake telegrams, a hateful stepmother, a titled Englishman, a drunk-

part in the production that he "was on it continually with the exception of an Alaskan trip and a couple of trips I might have made to New York. I was on it continually. I did nothing but that." The period referred to being twenty months.

Mr. Zanuck assigned Richard Sherman, an experienced scenarist, to write in association with Berlin, an arrangement or treatment of the scenario for the projected Alexander's Ragtime Band picture and they worked together on it for some three months. By March 3, 1937, they had finished and their draft had been mimeographed and submitted. It contains 121 typewritten pages and seeks to present the kind of love story contemplated in Berlin's outline. The time element, including the period from the date of Alexander's Ragtime Band in 1911 through the first World War and up to the climax of the concert at Carnegie Hall, some time around the middle of the 1920's, is preserved, but the main contribution of the Berlin-Sherman treatment was the supplying of the climax of the love story to coincide with the climax of the victory of the jazz music at that musical performance. The incidents bringing together the hero and heroine lovers as the triumphant finale of the hero's victory in both his music and his love affair, was developed in this composition in indicated action and in dialogue substantially as finally produced. Zanuck then engaged Sheridan Gibney, another well known writer, who in association with Berlin began work on March 9, 1937, and finished an outline of proposed scenarios of date April 3, 1937, and a complete dialogue scenario of date May 21, 1937. The dialogue scenario followed closely the composition of Berlin and Sherman but expanded and developed it.

Mr. Zanuck testified that he considered the work of Sherman and Gibney in their association with Berlin to be fine contributions but "we were disappointed still with our individual characterizations. We had a script that was away over length. It was not dramatically compact. * * * We decided to try other writers." He picked for the assignment Mr. Lamar Trotti, whom he considered the finest scenario writer in the moving picture business, and Miss Kathryn Scola. They commenced work June 10, 1937, and in their work they hit upon correction of what Zanuck considered a defect of the preceding scripts which was an insufficient contrasting of the type of the hero and the type of the heroine, by making the hero a high born gentleman of conventional culture in accepted music and in general, and showing the heroine to be of the type drawn from the other side of the tracks. The clash and struggle between the types of music personified by "Alexander" after he devoted his life to jazz and its advancement, and the type approved in the established order in music, shown in Berlin's original outline and in this contribution brought out the same fundamental elements of dramatic conflict in the love story. (Nothing similar is in the book). They produced a script of date August 11, 1937. Conferences were held on this script of Trotti and Scola September 8 and September 14, 1937. This resulted in revision, and on September 28, 1937, they submitted the first sixty two pages of a new script to Mr. Zanuck. A conference was held September 29, 1937. The final script was dated October 18, 1937, and the revised final January 7, 1938. The "shooting" final was completed January 27, 1938. Photography began in December, 1937, and was completed in May, 1938.

During the entire progress of this work it was frequently and fully discussed at conferences between the writers and Mr. Zanuck, Mr. Harry Joe Brown, the associate producer, and after his assignment to the picture, the director, Henry King. Full notes of the conferences were taken and they were stenographically reported by the secretary skilled in that work. The outline by Mr. Berlin and the several treatments subsequently composed and presented by the named authors together with the stenographic reports of the conferences, all of which were kept by the corporation in the usual course of business, presents

---

en and despised lover, assault and battery of the heroine, fighting in France and many coincidences that do not seem credible and many instances of past and expected plagiarism. It is only by a process of laborious search and dissection that anything in the book could be or has been formulated so as to present it for comparison with other compositions. It cannot be, and has not been claimed, that it ever has been read for any interest or entertainment it affords or any information it contains. What would be retained in memory from a reading of it for entertainment cannot be conjectured.

a completely documented history of the original composition of "Alexander's Ragtime Band" except as it is shown by the testimony of the director that in the process of the production after the script has been composed and agreed upon some minor changes may be made. The director finds that some items of picturization may, as a practical matter, be accomplished more effectively by his trial and error work in the studio.

Each and all of defendant's employees who had directional authority over any part of the production in question were called and testified as witnesses and their testimony developing all the details of the progress of the work cannot be read without the feeling that each individual testified with complete freedom, candor and frankness, without mental reservation. Collectively they are seen in the testimony to have been a hard working group, concentrating their energies upon their task of original composition and production: None of the witnesses on defendant's behalf was in any way discredited, and no question arises as to their conduct and demeanor while testifying because their testimony is in depositions. Each testified to his or her own part in originating the production. One or more specified items of similarity is claimed by plaintiff as to each of the respective contributions. Under the plaintiff's theory of copying, therefore, it was necessary to conclude from the comparison that there was concerted false swearing as to the fact of access by all of the witnesses who testified to their several contributions.

Throughout the great volume of the oral and documentary evidence on behalf of defendant each and all of the statements and circumstances disclosed tend consistently to establish the origination of the picture by the defendant as a complete unified and coherent work in general accord with the original conception of Zanuck and Berlin's outline.

Witnesses also testified who had nothing to do with the origination but were employed in carrying out the system maintained by defendant to identify and record the literary material made accessible to defendant and rejected or accepted for use by it. Considering the vital importance of that function to defendant (of which this case presents only a single illustration out of thousands) we think the testimony of these witnesses that the defendant never had access to plaintiff's book is also strong corroborative evidence of the fact. Defendant accepted no literary property from an unknown author like plaintiff for any purpose except through certain agents on its list of agents. The only two agents upon whom plaintiff has sought to cast suspicion were unknown to defendant and the testimony is that it would not have and did not have access to plaintiff's manuscript through either of them.

The testimony which emanates from plaintiff must also be held to be directly probative of defendant's lack of access to plaintiff's book when it is impartially looked at for what it shows rather than for what the plaintiff sees fit to suspect. She makes no claim in her testimony that she gave or caused access to her book to be given the defendant. She claims that one copy of the two copies of it that she had was kept sealed up on and after January 21, 1937, and the other confided to only two persons, who could, within rational possibility, have given access to defendant before defendant's exhibition. The persons were a Mrs. Malone and Mr. Laurence R. D'Orsay. Mrs. Malone not only testified positively that she made no disclosures and gave no access to the book to defendant but also that she had no acquaintance or contact with any of defendant's employees through whom she could have done so. Mr. D'Orsay also testified positively that he made no disclosure and gave no access to defendant and had no acquaintance or contact through which he could have done so. He kept the manuscript while it was in his possession in a closet in his private office and he expressed his certainty that no one else had taken it by saying that if anybody stole it, he stole it, but he did not steal it.

The evidence satisfies us that there was no rational possibility of access by defendant before the receipt of the manuscript by D'Orsay at Los Angeles the last of January, 1937.

The oral and documentary evidence in the record therefore establishes the fact that the defendant had no access to plaintiff's book unless the law of plagiarism permits the court to draw an inference contrary to such proof from its finding of similarities on comparison of the book with the picture.

Although this action is brought in Missouri under the laws of that state and not

898

for infringement of federal copyright, the law to be applied to it is found in the very numerous federal decisions which have fully expounded the origins, principles and philosophy governing the ascertainment, definition and protection of the right of property in literary productions, and there is nothing in any Missouri decision in conflict therewith. The District Court relied upon them. More than two hundred of the decisions have been brought to our attention by the diligence of able counsel and we have considered them.

As to the doctrine of unconscious plagiarism upon which the District Court made its determination against the defendant here, we are convinced that the proof in this case did not present a situation in which that doctrine may become applicable and that the court was in error in applying it.

■ The substance of the doctrine is that one may copy from memory, and where something has become familiar to his mind's eye and he produces it from memory and writes it down he may be held to copy it just the same without conscious plagiarism. Edwards & Deutsch Lithographing Co. v. Boorman, 7 Cir., 15 F.2d 35. Our search of the authorities has convinced it has never been and may not be applied in such a case as the present. The only cases we find in which it has been applied are cases in which access has been established actually or in consequence of copyright registration. As this plaintiff neither published her book nor registered it for copyright, and there is only a possibility in the sense that all things are possible, that defendant could have had access to it, it cannot be assumed that it had become familiar to the defendant's servants or that they unconsciously copied from it. Under the evidence in this case the defendant could not have come by plaintiff's document lawfully and if the bald assumption should be made that it did obtain access unlawfully in order to copy from it, then an unconscious copying would not be credible.

■ But we are equally convinced that the law of plagiarism has never been declared to sanction a determination of access upon a finding of mere similarities like those here involved in the face of such probative evidence of independent origination and of non-access as appears in this record. There is no question here of comparison disclosing any co-existing identities of substantial originated matter in the book "Love Girl" and the musical production "Alexander's Ragtime Band." The book is laid in part in the same period as the picture but it is about the loves of the love girl and her several lovers and there is no note of music in it. The picture's real interest and value as to every scene and action in it are in the music. Its presentation requires an hour and three-quarters and each minute is filled with action attuned to the music. Its audiences were "justly thrilled by the Berlin melodies, by the reminiscence they stir up, by the association they recall."

All the alleged similarities have been carefully studied in the light of the elaborate arguments of able counsel, but we are not persuaded that there is any similarity meriting discussion in the characters in the book and those in the picture, or in the themes, plots, structures, numerous locales, values or interests. There is no line of dialogue or wording common to both. As the texts of the parts of the book and of the picture that are questioned are too long to be set out for comparison purposes in their arguments, counsel on both sides have argued upon synopses of their own composition respecting each of the matters subjected to comparison. The synopses themselves are works of art eligible to copyright. Echevarria v. Warner Bros., D.C., 12 F.Supp 632. In the findings and opinion of the trial court those prepared for plaintiff have been adopted. We cannot reproduce them within the compass of an opinion and see no good purpose to be served by such an attempt, but upon careful study of them we content ourselves with stating baldly that the ultimate gist of the similarities which merit discussion is that both the book and the picture have a "gag" about a bootlegger concealing bottles of liquor in a baby carriage; a "gag" about a soldier in camp putting on a sweater too small for him; a "gag" about a soldier in the first war (shown sleeping in long underwear) hating to get up in the morning; in both a girl in a Pullman listens to a phonograph played by sentimental young folks "necking" there (the plaintiff called the song being played "Remember" but in the picture the words and music are of one of Berlin's most famous songs which was old at that time); an old music professor protests against his pupil playing jazz; musicians have trouble starting to play a new song; young women flutter around a handsome

young musician at a musical affair; a lover composes a song to his beloved (in the picture it is one of Berlin's); a young man objects to a girl's costume; parted lovers meet each other in a theater; a returned soldier finds his sweetheart married to another man and she tells him of it; a love scene on a moonlit balcony between a leader of musicians who has turned the lead over to the pianist and joined his lady; lovers parted as soldiers leave for camp or war; an approach is made to the interest of a prospective employer through a good meal provided him; a music professor uses the word "pizzicato" in speaking to his pupil, though in a different sense in the book and the picture; the heroine rides in a taxi, overhears music and converses with the driver who makes a small charge.

We have concluded that in their essence each of the items appearing to be similar (except those which plaintiff obviously copied from Berlin's old material) is a matter in the public domain. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F. 2d 49. In the picture each of the items connects up and is an integral part of the unity of both the musical and the action plot so that the originated matter composed in relation to the stock and commonplace matter in the public domain is readily distinguishable. But in the book most of the items are brought in haphazard, none being of apparent materiality to any discernible story plan.

No ordinary observer would receive any impression that the film is a picturization of plaintiff's book.

The items dwelt upon in the arguments have been and can be discovered only upon a dissection of the 295 typewritten pages of the book and of the picture, and the minutiae so culled out of their setting are in that way magnified out of proportion to their real insignificance in the respective compositions to the ordinary seeker of entertainment from them.

A number of plagiarism cases that have turned in the accuser's favor upon the comparison between the accused and the accuser's composition have been cases where there was access and where the identities or very great similarities were in original copyrighted matter of substantial importance in the accuser's work which we find lacking here, and even in those cases we find none analogous to the situation here where the fact of non-access has been established by evidence of wit-

nesses and documents which exclude all reasonable probability of access and leave only the bare possibility that all the witnesses intentionally swore falsely upon the matter of access of which they had full knowledge.

After all the long study of the plagiarism cases we must come back to recognition that the question in this case is simply whether the circumstantial evidence of the comparison from which one fair reader may draw one inference and another fair reader another, and neither can do more than speculate or suspect, can be held to sustain the plaintiff's burden to prove access and copying against the direct evidence of credible unimpeached witnesses and unquestioned documents that there was no access. We think the ruling must be controlled by the late decisions arrived at in full view of the long course of decision. In the Second Circuit, the judges having had most to do with declaring the law on the subject noted in Dellar v. Goldwyn, 2 Cir., 104 F.2d 661, 662, that a practice of disposing of plagiarism cases summarily on comparisons between a book and a play would be regrettable and pointed out that such comparison could not dispose of a case (unless against the plaintiff) because "if [the plaintiff] wins [on the comparison] the issue of copying remains to be tried." And in Darrell v. Morris, 2 Cir., 113 F.2d 80, that court although it considered the compared compositions so much alike "that the supposed piracy appears almost inevitable", and although there was some extraneous evidence of access, affirmed the decree dismissing the complaint for want of access and copying. See Sarkadi v. Wiman, 2 Cir., 135 F.2d 1002; Dellar v. Goldwyn, 2 Cir., 150 F.2d 612; Becker v. Loew's, Inc., 7 Cir., 133 F.2d 889; McConnor v. Kaufman, D.C., 49 F. Supp. 738, affirmed 2 Cir., 139 F.2d 116.

Although our circuit has not had occasion to declare the law in cases involving plagiarism, it is thoroughly committed upon mature consideration to the doctrine that the law does not permit the oath of credible witnesses testifying to matters within their knowledge to be disregarded because of suspicion that they may be lying. There must be impeachment of such witness or substantial contradiction, or, if the circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. The most that can be claimed for the result of the com-

parison between the book and the picture in this case is that it raises a doubt or suspicion that defendant might have had access. The suspicion cannot stand against the oaths of the witnesses who know the facts. We denied power in the fact finding body to find in disregard of this settled law. American Smelting & R. Co. v. National Labor Relations Board, 8 Cir., 126 F.2d 680, loc.cit. 688. See also Chesapeake & O. R. Co. v. Martin, 283 U.S. 209, 216, 217, 51 S.Ct. 453, 75 L.Ed. 983; Cf. Massachusetts Protective Assn. v. Mouber, 8 Cir., 110 F.2d 203, 206, 207.

The comparison here, when it is made in the atmosphere of the synopses of plaintiff's able counsel, does arouse speculation and it may be suspicion[2] as to how the similarities may have come about. But the function of the court is to apply the law so as to uphold property right in literary composition and not to undermine it or render it precarious, both for the obscure author who has only his own labor in his product, and for the producing corporations which have millions invested in their literary properties. Both must be made subject to and be afforded the protection of adjudication which is rested on the evidence of witnesses who know the facts and swear to them as against, circumstantial evidence which merely arouses speculation or suspicion. As the evidence here, when given the effect the law requires, proves that the defendant did not have access to the plaintiff's book, the decree in her favor based as we have determined, on error of law, must be reversed and the case dismissed at her costs.

It is unnecessary to consider the defendant's charge that the record conclusively shows that the plaintiff perpetrated a fraud upon the court in the prosecution of her action.

The judgment appealed from is reversed, with directions to dismiss the case.

JOHNSEN, Circuit Judge (dissenting).

If the typewritten manuscript, which appellee proffered as Exhibit 5, with its sealed wrapper missing, was, without alteration or substitution of pages, the copy of her book which she mailed to herself in 1937 under post office registration and seal, then I do not feel able to say that the trial court's findings on authorship, access and copying are clearly erroneous.

The similarities between appellant's film production and appellee's alleged book, in scenes, characters and incidents, are so many and substantial that I think the trial court could properly conclude that general coincidence was not a natural and satisfying explanation for them and that, with no common extraneous source shown, one must have copied from the other. The published opinion of the trial court, D.C., 54 F.Supp. 425, sets out the cumulative similarities, and I shall not recount them here.

My concept of the legal principles which the trial court was at liberty to apply to

---

[2] Many long hours have been spent by the court confronting those suspicions fanned by the arguments of able counsel which have been fully studied and considered. The fruit of our endless speculation (forming no part of the court's opinion which is based on the proof and not the speculation) may be stated: Plaintiff lived and wrote in the Berlin era of American music and with millions of others experienced some of its impacts. She was outside of it and expressed her longings by imitating the master. She says she "wrote Berlin style"; she copied the Berlin idea of naming a song "a band" and called the only short lines in her book shown to have been set to music for her, "Ditty Band"; it contained two lines lifted from Berlin; she took and used the main features of Berlin's successful army show of 1918 and as her book is gone through in detail many effects ultimately attributable to Berlin influence and to her interest in the Berlin work can be seen. But she only lived in the era, while Berlin was the great part of it. He wrote a thousand of its songs and in every year for thirty years he produced in a crowded song market either the most outstanding song hits of the year or one or more among the most successful. It seems possible that when he applied himself for twenty months with the others to composing the settings for his songs on the historic basis of his own associations and memories that their version included particulars that had come within plaintiff's range and so were in her book in some more or less discernible similarity. Undoubtedly Irving Berlin and his collaborators were intimately familiar with a myriad of scenic tricks, gags, and stage actions that had been used and were usable to put over the Berlin songs and music. Perhaps it was only coincidence that plaintiff, living and writing in the same period, also knew of a few.

the general situation can be simply stated. Access inherently is a sine qua non of copying, but proof of access, like other legal facts, may competently rest on circumstantial evidence and rational inference from it. Substantial similarities are always competent evidence of both access and copying. Ordinarily the question is merely as to the weight of the inference from the similarities, in comparison with the direct evidence of non-access and non-copying. That question generally is for the trier of the fact, unless the similarities are so insubstantial as rationally to be incapable of affording the basis for an inference. The right to apply these principles to substantial similarities is absolute where coincidence is not on its face a natural and satisfying explanation for them, where no extraneous source is shown as their common basis, and where all possibility of access is not excluded by the physical facts under the tests of general knowledge and experience.

I have indicated that in my opinion the similarities here were such in number and character that coincidence was not on its face a natural and satisfying explanation for them. Nor was any extraneous source shown as their common basis. And all possibility of access was not excluded by the physical facts under the tests of general knowledge and experience. As the trial court's opinion observed, 54 F.Supp. at page 427, during the period that appellant's movie script was in process of preparation at its studio, appellee's book was in Hollywood, in the hands of a literary agent and critic, whose staff had access to it; and another critic to whom the book previously had been submitted, and who, according to appellee, had suggested that it could be used as a vehicle for Irving Berlin's songs, was then also located in Hollywood. The court did not purport to declare that access had been obtained through one of these sources but only held that, since all possibility of access had not been excluded, the numerous and substantial similarities could properly be used to infer access as a general legal fact.

I qualified my initial statement that the trial court's findings on authorship, access and copying could not be said to be clearly erroneous, with the proviso, if the typewritten manuscript, which appellee proffered as Exhibit 5, with its sealed wrapper missing, was, without alteration or substitution of pages, the copy of her book which she mailed to herself in 1937 under post office registration and seal. On the question implied by the proviso, I think the trial court should have granted appellant's motion to reopen the case.

Appellant's motion to reopen was made after the case was submitted but before findings had been filed and judgment had been entered. It charged that some of the exhibits which appellee had proffered, including Exhibit 5, were altered documents and that a fraud thus had been perpetrated on both the court and appellant. As to Exhibit 5, the attempt was to show that it had not been kept under its original post office seal and that its similarities with appellant's film production were due to alterations and substitutions which appellee had made after she had seen appellant's movie in 1938. A year before the trial appellee had brought Exhibit 5 into court purportedly under its original post office seal, but no one at that time apparently had any thought that the seal might have been broken and replaced. Appellant had asked, however, that the wrapper be preserved, but on the trial appellee claimed that it had been lost or destroyed. There were other circumstances also that on their face invited proper explanation. Counsel for appellee conceded that the showing was such that the situation "needs decidedly to be explained", but he made most of the explanation by mere statement in oral argument against the motion and not by conventional legal standards. I think the trial court should have explored the issue on its merits and made resolution of it by regular findings of fact.

I would reverse the judgment and remand the case for trial and findings on the issue of possible fraud. I have the frustrating feeling that there is something in the situation that has not been entirely reached. Certainly, if appellee has altered Exhibit 5 since seeing appellant's movie, or has in any other material way attempted to deceive the court in the situation, she is not entitled to the judgment which she has received at the court's hands. If on a trial of the issue, the court shall find that she has not been guilty of fraud, then it may in its wisdom reenter the previous judgment.