## PINCI v. TWENTIETH CENTURY-FOX FILM CORP.

Civ. No. 29–250.

United States District Court
S. D. New York.

Feb. 26, 1951.

Emerson L. Simon, New York City (Julian I. Bergoffen, New York City, of counsel), for plaintiff.

Dwight, Royall, Harris, Koegel & Caskey, New York City (Whitman Knapp, Vincent L. Broderick, New York City, of counsel), for defendant.

SAMUEL H. KAUFMAN, District Judge.

This is an action for damages for infringement of a copyrighted play and for an accounting by defendant. Jurisdiction is based on 17 U.S.C.A. § 34 and 28 U.S.C.A. § 1338.

In 1929, a copyright was issued to plaintiff covering a play entitled "Woodrow Wilson". This play was never published or produced. Between 1942 and 1944 defendant made a motion picture called "Wilson", and this picture was publicly distributed some time after 1944. Both the play and the motion picture attempt to portray events in the life and times of the late President Woodrow Wilson. Insofar as these two works deal with President Wilson's public policies, both focus attention on the events leading up to the participation of the United States in World War I, the postwar struggle over the peace treaty, the creation of the League of Nations, and the attitude of the United States toward adherence to the League. While the motion picture development of Wilson's war and peace policies makes use of many of the historical episodes that plaintiff used in his play, no claim is made that the general similarity of the development of this theme infringes plaintiff's copyright. Instead, plaintiff contends that defendant copied or made use of the manner in which plaintiff developed certain scenes and that the situations and language in these scenes are protected by the copyright.

Although the play was never produced or published, plaintiff urges that defendant's employees could have copied from it because it was twice submitted to defendant before the motion picture was produced. The facts are that in 1937 the play was first submitted by plaintiff's agents to Earl Carroll, who was then in defendant's employ. The play was returned almost immediately, without the wrapper on it having been opened. Further, there is no showing that Carroll was in any way connected with the production of the film. On April 25, 1940 the play was again submitted to defendant's New York Story Department, which returned it in four days after making a seven page synopsis. The synopsis was then forwarded to defendant's California offices, where it was filed along with thousands upon thousands of other synopses in defendant's possession. Again, there is no proof that anyone connected with

producing the motion picture saw either the play or the synopsis; futhermore, other than possibility of access to the file in which the synopsis was deposited, no fact has been adduced from which it could be inferred that anyone connected with the production of the motion picture did in fact see or use any part of plaintiff's play. This conclusion is not affected by the fact that in 1943, while the script of the picture was being written, plaintiff wrote to the defendant and also to the producer, calling his play to their attention.

It appears from the evidence that some time in August, 1942, Darryl Zanuck, vice-president of defendant in charge of production, decided to make a motion picture dealing with the life of Woodrow Wilson. Between that time and November, 1943, when the actual filming was begun, defendant made extensive preparations to assure that the picture would be accurate as well as entertaining. Lamar Trotti, one of the studio's leading script writers, was assigned to prepare the scenario. He immediately commenced research on the life of the late President, reading books about him as well as New York and Washington newspapers covering the period of his presidency. He also went to Florida with a draft of the script to see Dr. Ray Stannard Baker, who has been regarded as the official biographer of Wilson, and to North Carolina to see Josephus Daniels, a member of Wilson's cabinet. He had consultations with many other people who knew Wilson, and other employees of defendant also spoke to people who had personal knowledge of the late President. The director of the picture, Henry King, and at least one other employee of defendant, personally visited Trenton, New York, Baltimore and Washington to examine the buildings and rooms in which Wilson had lived in order that these and their furnishings would be faithfully duplicated in the picture. The film rights to a number of books and plays[1] were purchased and material in these works was used by Trotti in writing the script. In addition, Trotti received much help from Dr. Baker, who was hired by defendant as consultant and technical advisor. Dr. Baker spent five months at defendant's studios, and not only took an active part in the preparation of the picture, but also, on two occasions, visited Mrs. Edith Bolling Wilson, the late President's wife, to get her suggestions for script revisions.

Defendant denies infringing plaintiff's play and contends that insofar as screen material was derived from written sources it was from works other than plaintiff's play. The script writer, the director, and the producer of the motion picture all deny having read either the play or the synopsis thereof before the picture was completed, and all deny copying therefrom.

■ In view of the possibility of access to the play, it becomes necessary to determine whether there is sufficient similarity between the two works to warrant an inference that parts of the motion picture were copied from the play. In such circumstances, the similarities must be such that copying is not merely suspected, but is established with reasonable certainty. See Twentieth Century-Fox Film Corp. v. Dieckhaus, 8 Cir., 1946, 153 F.2d 893, 899, certiorari denied 329 U.S. 716, 67 S.Ct. 46, 91 L.Ed. 621; Christie v. Harris, D.C.S.D.N.Y.1942, 47 F.Supp. 39, 40, affirmed 2 Cir., 154 F.2d 827, certiorari denied 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634.

As an aid in determining the similarity in the two works, plaintiff has submitted a list of items which defendant is alleged to have copied from the play. These fall into three classes. In the first are items which are so dissimilar that it requires considerable effort to discover any point of resemblance. Illustrative of these is plaintiff's claim that the following conversations are similar: In the play, Wilson tells McAdoo that "the fashionable dinner table is the source of many things that are not so, things that one never hears anywhere else", and McAdoo then relates

---

1. These include My Memoir, by Edith Bolling Wilson; The Woodrow Wilsons, by Eleanor Wilson McAdoo; and In Time to Come, by Howard Koch.

the latest story about German barbarity. In the motion picture, Wilson remarks to his wife that a great deal can be learned by listening to what one's enemies say, and the two then laughingly relate how Mrs. Wilson has been called a German spy, how the President was charged with having bargained with Wall Street to bring on the war and with being insane, and the like. Many other items on the list are equally dissimilar.

In the second group are instances of claimed similarity, where the material in the motion picture bears a closer resemblance to other sources than to the play. In this group can be placed such items as the scene in which the newsboy comments on the Princeton football team[2], and a senator's remark about Italians burning candles before Wilson's picture[3].

The third group consists of items which can be attributed as much to a common source as to material in the play. Typical of this category are the following: The signing of the peace treaty at Versailles, the scene with Senator Lodge on Wilson's last day in office[4], and a speech, which, in the film, is delivered at Pueblo[5].

It is clear that the majority of instances of purported similarity listed by plaintiff furnish no basis for a finding that defendant copied from plaintiff's play. However, there are three matters that plaintiff regards as especially important. The first of these is the manner of excerpting President Wilson's speeches. The second is a meeting between Wilson and Count von Bernstorff, the German Ambassador to the United States prior to our entry into World War I, and the third is the so-called "milk and crackers" scene.

*1. The manner of excerpting speeches.* In view of the common practice of newspapers, magazines, plays, and novels to present public speeches by means of ex-

cerpts, it is not surprising to find that both the play and the motion picture use this method of presenting some of President Wilson's speeches, and no inference of copying is warranted from the use of such a method. Particular stress is laid upon the extracts from the war message as given in the film, which plaintiff claims parallel the extracts as given in the play. While the two have much in common, they are by no means identical. The message as given in the motion picture leaves out much that is in the play. Indeed, the film version bears a closer resemblance to the extract in a play purchased by defendant[6] than to the extract in plaintiff's play. Considering that both plaintiff and defendant probably wished to present the most dramatic part of this dramatic message, it is understandable that the two versions should bear some resemblance, but what similarity there is does not evidence infringement.

*2. The meeting with von Bernstorff.* Since defendant has conceded that there never was a meeting between Wilson and von Bernstorff, some discussion of the treatment of this fictional incident in the play and the picture is necessary. In plaintiff's play, von Bernstorff comes to see Colonel House at the White House in May of 1915 to express his personal regrets over the sinking of the Lusitania. The President and the Ambassador meet by chance and the President expresses his appreciation of von Bernstorff's personal desires for peace and his own views on freedom of the seas. The scene ends with the President indicating he will send the German government a note on this subject. In defendant's motion picture, the meeting between the two takes place in the White House in 1917, shortly before war is declared. Secretary of State Lansing has brought the Ambassador to

---

**2.** See Eleanor Wilson McAdoo, The Woodrow Wilsons, at 113.

**3.** See Ray Stannard Baker, The American Chronicle, at 359. Although this book was published after the picture was completed, the author was active in the production of the film and made many contributions to it.

**4.** See The New York Times, March 5, 1921, page 5; Edith Bolling Wilson, My Memoir, at 318–319.

**5.** This is an extract from a speech actually delivered in St. Louis in 1920.

**6.** See Koch, In Time to Come, at 5–6.

the White House late at night because Germany had just announced it would resume a policy of unrestricted submarine warfare. Lansing also discloses the discovery of German tampering with State Department cables to foment trouble in Mexico. President Wilson then angrily voices his indignation at German duplicity, cruelty and militarism. The scene ends with Lansing being ordered to give von Bernstorff his passports.

The purposes served by the meeting of these two persons is entirely different in each work. In the play, it is a prelude to the Cabinet meeting in which Wilson declares he will send Germany a firm note on the sinking of American ships but will not declare war. In the motion picture, it is the prelude to the declaration of war. Not even the character of von Bernstorff is similar in the two works. In the play he appears to be an honorable gentleman, peace-loving, and somewhat at odds with his own government's policy. In the picture, his appearance seems to have been intended to symbolize Prussianism and militarism. In all respects other than the mere fact of a face to face meeting between Wilson and von Bernstorff there is no similarity whatever in the two works.

*3. The "milk and crackers" scene.* In the play, the President, who cannot sleep, is shown in his bedroom preparing his war message late at night. Upon the entry of his wife, Wilson declares he feels better now that he is no longer indecisive about going to war, and he declares that he is hungry. Mrs. Wilson brings him a pitcher of milk and some crackers. After a few lines of conversation, the President returns to his work. In the motion picture, Wilson is shown in the Oval Room of the White House working late at night on his note to Germany over the Lusitania sinking. His daughter Margaret comes into the room with a tray of sandwiches and a glass of milk, and urges him to get some sleep. The rest of the scene is devoted to showing how much the President misses his first wife, who had just recently died.

That there is some similarity in the two scenes cannot be denied. While in both Wilson is shown working late at night and doing his own typing, plaintiff can hardly claim that these characteristics of the President were not known to many people. The major point of resemblance in the two works is that a member of Wilson's family brings him some milk and simple food. Aside from this, the treatment of the episode is entirely different.

The bare similarities to be found in the von Bernstorff meeting and the "milk and crackers" scene afford no basis for finding an infringement. In both the play and the motion picture these are very small and relatively trivial incidents. It is doubtful whether such incidents per se are protected by the copyright. See Frankel v. Irwin, D.C.S.D.N.Y.1918, 34 F.2d 142, 143; Eichel v. Marcin, D.C. S.D.N.Y.1913, 241 F. 404, 409. But even if they are, the proof does not justify a finding that defendant copied any substantial part of the copyrighted matter. Futhermore, these incidents thus far have been treated in isolation from the two works as a whole. After reading the play and the film's script and after seeing the motion picture, it is apparent that the play and the picture are completely dissimilar. The play is concerned almost exclusively with the presentation of public policies and Wilson's attitude toward the political problems presented. There is little of the President's domestic life. In contrast with this, the motion picture deals as extensively with Wilson's domestic life as with his policies. In addition, the play covers only the period after Wilson became president, while the motion picture presents considerable material covering the years when Wilson was the head of Princeton University and the Governor of New Jersey before he became president.

█ Considering the great dissimilarity of the two works in relation to the minor resemblances, at best, that are asserted, a comparison of the two does not warrant the conclusion that copying has occurred. The mere possibility of access

to the synopsis of the play in defendant's files or to the play itself is not enough to overcome the testimony of the writer, producer and director of the film that they did not see plaintiff's work and did not copy from it. See Twentieth Century-Fox Film Corp. v. Dieckhaus, 8 Cir., 1946, 153 F.2d. 893, 899, certiorari denied 329 U.S. 716, 67 S.Ct. 46, 91 L.Ed. 621. The dissimilarity of the works themselves fortifies the credibility of that testimony, as does the proof of defendant's good faith in obtaining the screen rights to books and plays dealing with Wilson's life and in hiring Dr. Baker as an advisor and in making other extensive preparations to produce this motion picture.

Under the statute, defendant is entitled to counsel fees. A hearing will be had on a date to be agreed upon by counsel to fix the amount of such counsel fees.

I assume that the findings of fact and conclusions of law herein stated are sufficiently specific. If more is desired, specific findings of fact and conclusions of law consistent herewith may be submitted for consideration.

Complaint dismissed on the merits.